## THE STATE ex rel. EDWARD E. GUION v. JAMES P. MILES et al.

**In Banc, February 27, 1908.**

1. **STATUTORY CONSTRUCTION: Borrowed from Another State: Primary Election.** When a statute is in the main a copy of the statute of another State, a construction placed thereon by the highest court of that State prior to its adoption in this State, will be presumed to have met the approval of the General Assembly adopting it. Nor is it necessary that the statute be literally copied; if the substance of the statute or some controlling word be borrowed and adopted by the General Assembly, the construction placed thereon by the court of the foreign State prior to its adoption will be followed by the courts of this State.

2. **Party Committees: Voluntary Association; Primary Election.** Under the Act of 1901, providing for the election of the members of the general committee of a party, by the voters of the party, at a primary election, held under the control of the election commissioners, in cities of three hundred thousand inhabitants or more, and giving them a term of two years, the voluntary character of the committee has been destroyed.

3. ———: **Removal of Members.** Under said Act of 1901, the party committee is no longer the judge of the election and qualifications of its members, nor has it any power to remove a member. The act gives to the party voters, and not to the members of the committee, the right to say who its members shall be. The committee has no power, for any reason, or upon any pretext whatever, to remove a member.

4. ———: ———: **Rules: Creating Vacancy.** Said act, in providing that "the rules and regulations of parties and of the conventions and committees thereof shall not be contrary to or inconsistent with the provisions of this act, or of any other law of this State, and shall not be amended except upon

reasonable notice," did not give the party committee power to make a rule providing for the removal of a committeeman for "failure without a reasonable excuse to attend three consecutive meetings of the committee." It did not give the committee power to expel a member, or to create a vacancy and fill such vacancy by appointment of another. The rules contemplated by that provision were those having reference to the details of the management and conduct of the committee's business.

5. **PARTY COMMITTEEMAN: Wrongful Removal: Restitution By Mandamus.** Mandamus is an appropriate remedy to have restored to his place on the party committee a committeeman who was elected in the manner prescribed by statute by the voters of his party at a primary election, entered upon the discharge of its duties, and was illegally removed therefrom by the committee, even though the committee, after his removal, appointed another to his place and that other has assumed to exercise the duties of the position and is recognized by the committee as a legal member.

6. —————: —————: —————: **Public Officer.** In such case it is not necessary to determine whether or not relator is a public officer, or the position of committeeman a public office. The position of committeeman was created by statute, which provided that he could be chosen only by the voters of his party at a primary held under the control of the election commissioners, and made the matters about which he performs his service those of public concern, and the characteristics of the position are analogous to those of a public office. In such case mandamus is an appropriate remedy to restore a committeeman who once having entered upon the discharge of the duties of his position, was wrongfully removed, whether the position be a public office, or quasi-public office, or a position analogous to that of a public office. It is a statutory position, and if relator was illegally removed therefrom, he is entitled by mandamus to be restored thereto.

7. —————: —————: —————: —————: **Title to Office: Vacancy.** The mere claim to an office by one whose claim is not based upon even a color of right, or who is at most an intruder, does not put the title to the office in issue, and falls far short of being sufficient to prevent the issuance of the writ of mandamus to restore one who has been legally elected. And where relator was legally elected and entered upon the discharge of the statutory position of party committeeman, and was removed by the other members of the committee, who appointed another person to his position, there was no vacancy, for the committee had no power to remove him and no power to create a vacancy and its action was a nullity, and hence the title to the position is not involved.

State ex rel. v. Miles.

8. ———: ———: ———: **Intruder.** Where one has been wrongfully deprived of an office by the illegal appointment of another, mandamus will issue to effect his restitution, even though such appointee be in possession *de facto,* for in such case the appointee is a mere intruder.

9. **PRIMARY ELECTION LAW: Constitutionality: New Writ of Mandamus.** Where the court determines that relator is entitled to invoke the constitutional writ of mandamus to be restored to a statutory position from which he was wrongfully removed, it isunnecessary to determine whether or not the statute creating the position changed the nature and character of the writ of mandamus contemplated by the Constitution.

10. ———: ———: **Right to Invoke.** Where respondent members of a party committee hold their positions by virtue of a statute, and contend that such statute gave them power to remove a committeeman, the court will not look with favor upon their contention that the statute is unconstitutional.

11. ———: ———: **Wisdom.** The courts have nothing to do with the wisdom of a law. If it is a reasonable regulation of a matter of public concern, like primary elections for the nomination of candidates or the election of party committeemen, it will be upheld.

12. ———: ———: **Power of Legislature.** The General Assembly is authorized to enact reasonable legislation providing for the regulation of party primary elections and the election of committeemen and other officials to conduct such elections.

**Per VALLIANT, J., in a dissenting opinion, with whom GRAVES, J., concurs.**

1. **PRIMARY ELECTION LAW: Non-Judicial Matters.** Courts have no jurisdiction to decide causes in which neither life, liberty nor property is involved. The right to be a member of a mere voluntary committee, whether organized for social, political or religious purposes, is outside the realm of the judiciary.

2. ———: ———: **Free Government.** When the government undertakes by its courts to regulate such matters, it goes beyond the scope of legitimate free government.

3. ———: ———: **Voluntary Organization: State Committee.** A political committee is a voluntary organization, governing itself by its own rules and answerable only in the forum of the public opinion of the fellow-citizens of their party, and until it or its members impinge on the property rights of an individual or his rights as a citizen, the courts have nothing to do with them. A difficulty over the right of a citizen to be a member of a city committee should be taken to the State committee of the party for settlement.

210 Sup—9

4. ———: ———: ———: **Legislative Power.** The General Assembly has no authority to convert a mere voluntary organization, whether political, social or religious, into a State institution and clothe its members with the authority of State officials.

5. ———: ———: **Party Committees: Disloyalty of Members.** If the courts are called upon to decide that a party committee cannot make rules for the expulsion of a member, it would be in the power of the General Assembly to say that a member may be expelled for disloyalty to his party, and to give to the courts power to determine when a member's action is disloyal, and thereby to invest them with power to advance or impair the fortunes and affairs of a political party, and to shape political matters and determine purely political questions.

6. ———: ———: **Party Committeemen: Official Character: Statute.** The only clause of the statute which gives official character to the position of a party committeeman is this: "Each party shall have a general committee for each county to which this act is applicable, and the city of St. Louis shall be construed as a county for the purposes of this act." *Held,* that this clause is not sufficient to give official character to a political committeeman, who prior to its enactment was a member of a voluntary association, and in that respect it differs from the New York statute, which contained a clause providing that the conduct of the committee should be under the control of the provisions of that act, and the omission of that clause from the Missouri statute signifies that the General Assembly intentionally refused to bring the conduct of the committee into subjection to the provisions of the act.

7. ———: ———: **Mandamus: Legislative Power.** The original writs mentioned in the Constitution which the Supreme Court may issue are common law writs or writs having the scope they had at the time the Constitution was adopted, and the Legislature cannot broaden the scope of these writs so as to make the Supreme Court a trial court or a court of original jurisdiction of causes not contemplated by the Constitution; for instance, the General Assembly has no authority to say that under a writ of mandamus or *certiorari* the Supreme Court shall exercise original jurisdiction to try a contested election case.

8. ———: **Committeeman: Public Officer.** A party committeeman is either a public officer or he is not, and if he is not an officer he is not entitled to judgment as if he were an officer. A quasi-officer is a term without legal status, and before the courts can determine a claimant's right to a position his legal attributes must be defined.

## Mandamus.

PEREMPTORY WRIT AWARDED.

*Walter B. Douglas* for relator.

(1)   Since the passage of the Act of March 13, 1901, the Democratic City Central Committee of St. Louis has ceased to be a voluntary association and has become a legally constituted body, governed by the statute. Laws 1901, p. 161; People ex rel. v. Dem. Gen. Com., 164 N. Y. 335; State ex rel. v. Witthoeft, 117 Mo. App. 625.   (a)   The law provides that the members of the committee shall be elected biennially at the primary elections. Laws 1901, p. 161, sec. 21. A large portion of the expense of these primary elections is borne by the public. P. 149.   (b)   The committees are not made judges of the election and qualifications of their members. Laws 1901, p. 149.   (c) The right of committees to make rules is recognized by law, but it is provided that:  "The rules and regulations of parties, and of the conventions and committees thereof, shall not be contrary to or inconsistent with the provisions of this act, or of any other law of this State."  Laws 1901, p. 161, sec. 21, subdiv. 2.   (d) Since the law provides for the election of committeemen, by the direct vote of the people, for a term of two years, no committee has the right to adopt or enforce a rule that a committeeman might be expelled for being absent without reasonable excuse from three consecutive meetings. People ex rel. v. Dem. Gen. Com., 164 N. Y. 335; State ex rel. v. Witthoeft, 117 Mo. App. 625. Such committee has no right to expel a member for any cause without a hearing.   (2)   That mandamus is the proper remedy to compel the restoration of a party to any office or franchise of a public nature is settled beyond question. St. Louis County Court v. Sparks, 10 Mo. 117; 3 Blackstone, 110.   To

the same effect are: High on Extraordinary Legal
Remedies, secs. 67-72, 407-408; 2 Bailey on Jurisdic-
tion, secs. 707-710; 2 Spelling, Extraordinary Rem-
edies, sec. 1576; Merrill on Mandamus, sec. 148; Wood
on Mandamus, p. 74; Moses on Mandamus, pp. 149-
150; Tapping on Mandamus, pp. 12, 38, 190-1; Shortt
on Informations, pp. 283, 292; Throop on Public Of-
ficers, secs. 825-829; Mechem on Public Offices, sec.
980; 2 Dillon on Municipal Corporations, sec. 847;
Miles v. Stevenson, 80 Md. 358; Metsker v. Neally,
41 Kan. 122; Eastman v. Householder, 54 Kan. 63;
Ex parte Lusk, 82 Ala. 519; Milliken v. City Council,
54 Tex. 388; Lewis v. Whittle, 77 Va. 415; Hill v.
Fitzgerald (Mass.), 79 N. E. 825; State ex rel. v.
Shakespeare, 45 La. Ann. 92; State ex rel. v. Common
Council, 9 Wis. 254. (a) And when one has been
wrongfully deprived of his office by the illegal appoint-
ment of another, the writ will go to compel his restora-
tion, even though the person appointed in his stead be
in possession *de facto*. People ex rel. v. Ahearn, 98
N. Y. Supp. 492; Pratt v. Board of Police and Comrs.,
15 Utah 1; Smith v. Lawrence, 2 S. D. 206; Metsker
v. Neally, 41 Kan. 122; Dew v. Judges, 3 Hen. & Mum.
1; High on Extraordinary Legal Remedies, 67; 2 Spell-
ing on Extraordinary Remedies, sec. 1576; State ex
rel. v. Board, 134 Mo. 296; Jones v. Wilcox, 80 N. Y.
Supp. 420. (b) There is here no defect of parties.
It is not necessary to make all of the members of the
committee respondents. "It is not the practice to
make any person a defendant to a petition for man-
damus but the officer whose conduct is complained of."
Fry, Collector, v. Reynolds, 33 Ark. 450; Smith v.
Lawrence, 2 S. D. 207; Heintz v. Moulton, 7 S. D. 272;
Lamb v. Lynd, 44 Pa. St. 336; Atty.-Gen. v. Newell,
85 Mo. 246; Goodell v. Woodbury, 71 N. H. 378; In
Matter of White River Bank, 23 Vt. 478. (c) Where
the circumstances are such that the respondents have

distinctly manifested their purpose not to perform their duty resting upon them, no demand is necessary. Humboldt County v. Commissioners, 6 Nev. 30; Railroad v. Commissioners, 49 Kan. 399; Heintz v. Moulton, 7 S. D. 272. (d) It must appear, however, that the respondents are actually in default in the performance of some act which the law specially enjoins as a duty resulting from their position. Cincinnati College v. La Rue, 22 Oh. St. 469; Comrs. of Highways v. Jackson, 165 Ill. 22. (e) The allegation of the alternative writ is that the primary election was held under and pursuant to the Act of March 13, 1901. Where the purpose of the writ is merely to restore the *status quo,* it is not necessary to allege the details or the receipt of a certificate of election. State ex rel. v. McCaffery, 108 Mo. App. 59, arose upon entirely different facts, and is not in point in this case.

*Sam B. Jeffries* and *John M. Wood* for respondents.

(1) The Primary Election Law of 1901 did not change in any respect the status of the committee, or of its members. The members of these committees have been elected biennially since the earliest recollection. The statute did not, therefore, change the existing law in this respect. It will be seen by reference to section 15 that the candidates for committeemen as well as for public office are required to pay *pro rata* the expense of the primary election. We submit that if by long-settled custom the committee had acquired the right to judge of the election and qualifications of their members, nothing less than a positive statute could deprive them of that right. Again, it being presumed, in law, that at the time of enacting our statute the Legislature was advised of the interpretation of the New York statute and of the significance given to the word "conduct" as used in the first section of the latter statute, can the omission of this word by

our Legislature in adopting said section be construed otherwise than as a deliberate intention on its part to prevent this section from receiving the construction placed upon the section from which it was taken by the New York court, or, in other words, to allow the committee to retain its long-established right of self-government? What is said by the Court of Appeals in State ex rel. v. Witthoeft, 117 Mo. App. 625, regarding the meaning of the act in question, is merest *dicta*. (2) In both his oral argument and brief counsel for relator has declined to define his position on the question as to whether members of the committee were public officers. In his brief he says: "Whether he [the committeeman] is an officer or not, I take it, can make no difference in the result of this case. He is elected by the people, under the law, for a two years' term, with certain duties placed upon him by law, which duties are of a public nature." We cannot accept either of these conclusions. The committeeman is not elected by "the people" (i. e., the general public, which is the sense in which these words are used by relator's counsel), but by only a portion (and it may be a very small portion) of the people. Nor are the duties placed upon the committeeman "of a public nature." They are of a party nature only. They pertain only to the interests of a particular political party or faction, and have naught to do with the public. Again, if the committeeman is not a public officer, it was a vain thing for relator's counsel to consume time in collecting the authorities cited and quoted in support of procedure by mandamus. For, upon examination, it will be seen that these authorities apply only to controversies over public office. The question as to whether or not a committeeman is a public officer is very important in the consideration of this case. Is a committeeman a public officer? He is not. State ex rel. v. Valle, 41 Mo. 29; State ex rel. v. Bus, 135

Mo. 325; State ex rel. v. Harter, 188 Mo. 528; State ex inf. v. Washburn, 167 Mo. 692; State ex rel. v. Gray, 91 Mo. App. 445; Bun v. People, 45 Ill. 397; State ex rel. v. May, 106 Mo. 488. The act in question not only does not declare the committeeman an officer, but repeatedly distinguishes between them. Section 15 et al. The authorities, therefore, which relator has cited in support of his procedure and which apply to contests over public offices, are irrelevant to this discussion. If they were relevant, we think the Missouri authorities clearly show that under the settled law of this State relator has not adopted the proper procedure. But the relator further contends that section 23 of the Act of 1901 authorizes the procedure he has adopted. The answer to this contention is given by this court in State ex rel. v. Reynolds, 190 Mo. 578.

FOX, J.—This is an original proceeding begun in this court, by which it is sought to obtain a peremptory writ of mandamus directing the respondents to reinstate the relator in his rights and privileges as a member of the Democratic City Central Committee of the city of St. Louis.

The relator in this cause on December 23, 1907, filed in this court an amended information, which substantially charges that the relator was on the 6th day of October, 1906, duly elected a member of the Democratic City Central Committee from the sixth ward of the city of St. Louis by direct vote at a primary election of the Democratic voters of said ward in said city. It is further averred that the primary election on the date heretofore mentioned was held and the committeemen chosen at such election were chosen in pursuance of an Act of the General Assembly of Missouri, approved March 13, 1901, relating to primary elections in cities having three hundred thousand inhabitants, and that the committeemen elected at said

primary election were to represent the members of the political party known as the Democratic party, a political organization, which at the last preceding election polled ten thousand votes or more for Supreme Judge (no Governor being elected at such election). That the primary election at which relator was elected was held in pursuance of the provisions of the primary election law heretofore indicated, under an official call therefor by said Democratic City Central Committee of said city, the same being the managing and controlling committee of said party in said city. In pursuance of the official call for the primary election a notice was published, in accordance with the requirements of the act of the General Assembly for the primary, by the election commissioners of said city. The official call for the primary, as before suggested, specified, among other things, that "at the same primary election there shall also be elected by the direct vote of the Democratic electors in each of the twenty-eight wards one member of the Democratic City Central Committee to serve for the ensuing two years," and said notice specified, among other things, that "at said primary election there will also be elected by the direct vote of the Democratic electors in each ward one member of the Democratic City Central Committee to serve during the ensuing two years."

It is also averred in the information filed by the relator that after he was elected by the Democratic electors of the sixth ward of the city of St. Louis, as before stated, he received from the election commissioners a certificate of election, as provided in subdivision 4 of section 19 of said act, and entered upon the discharge of his duties as a member of said committee, and continued to act as a member thereof, in conjunction with the other persons elected as members of said committee elected at said primary election, and in every way performed his duties and exercised

his rights as a member of said committee up to and until the 23d day of September, 1907.

It is further alleged in the information that the said Democratic City Central Committee of the city of St. Louis prior to August 26, 1907, adopted certain rules, one of which at the time mentioned therein was as follows: ''The committee shall meet the first Monday of every month, and during a campaign the committee shall meet as often as the majority may deem best.  At the request in writing of a majority of the committee the chair shall call a special meeting of the committee by giving at least two days' notice of the same to each and every member by written notice addressed to the member's residence.''

Another of said rules at the time mentioned was: ''The causes for which a committeeman may be expelled are:  3d.  Failure without a reasonable excuse to attend three consecutive meetings of the committee.'' Then follows an allegation in the information that the relator failed to attend three consecutive meetings of said committee (said meetings having been held weekly, though it was not during a campaign); that at a meeting of said committee held on the 23d day of September, 1907, a resolution was presented, voted upon and declared by the chairman to be adopted, expelling the relator from membership in said committee because of his having been absent from three consecutive meetings of said committee.  Following these allegations are the names of those voting in favor of said resolution of expulsion, and then it is charged that other persons whom the committee had wrongfully admitted to act as members of said committee voted upon the resolution.

It is also averred and charged that, after the adoption of the resolution expelling relator from the committee, at a meeting of said committee held on October 1, 1907, a pretended election was had, participated

in by certain members of the committee and others whom they had wrongfully admitted as members of said committee, and that at such election one Patrick F. Garvey was admitted to said committee in place of this relator. It is then expressly alleged that no charges or specification of charges were ever preferred against the relator at any time. That he never received any notice that any charge would be preferred against him and that no opportunity was ever given to him to defend himself against the accusation that he had been absent from three consecutive meetings of the committee, or to show his excuse for such absence. Then follows the averment that ever since the said 23d day of September, 1907, the date of the passage of the resolution expelling relator, the said respondents have wrongfully conspired and combined together to deny and have denied to relator admission to the meetings of said committee, and the right and opportunity to perform his duties and exercise his rights as a member thereof.

It is further alleged that there was no right or power conferred by the act of the General Assembly upon members of the central committee to expel any of the members of said committee selected by the electors of their party in the respective wards that they represented, and that the acts of the committee in adopting such resolution were a nullity and of no force or vitality, and that the pretended election of Patrick F. Garvey to membership in said committee in place of this relator was and is illegal and void, and conferred no right upon said Garvey and that said Garvey is not a member of said committee, either *de jure* or *de facto*, and is wholly without right to do any act as said member.

Then follows an averment in the information that said committee was without power, right or jurisdiction in law to expel a member of said committee, and

had no authority to make the rule herein indicated, authorizing an expulsion of a member of the committee for absence from three consecutive meetings.

"Relator further states and shows to the court that the action of the said respondents last above named and of said committee, in undertaking to expel this relator from said committee and in admitting said Garvey to act as a member of said committee in his place, was wholly without authority or jurisdiction in law, was contrary to law, and violated section 30 of article 2 of the Constitution of Missouri, and deprived relator of his property without due process of law.

"The relator further shows that the term for which he was elected to be a member of said committee will expire prior to the time when in the ordinary course of litigation beginning in the circuit court, this case should be finally adjudicated and determined; and that even should the case be advanced upon the docket of this court, when it comes here upon appeal, it could not be reached and decided until after the time when all of the important work of the committee remaining to be done during the term for which this relator was elected, would necessarily have been done and performed, leaving nothing to be done by the relator upon reinstatement; that owing to the fact that the rights and duties of relator are his in a representative capacity, conferred upon and committed to him by the vote of the Democratic voters of said ward, and owing to the fact that his place in said committee is occupied by a usurper who assumes to exercise the rights and perform the duties thereof, not as a representative of the voters but as a mere instrument of the respondents last hereinabove named, and owing to the fact that the admission of said Garvey to act as a member of said committee is unauthorized by and is contrary to law, this case is one in which the

rights of the public are involved and are dependent upon its speedy determination."

In conclusion the relator, upon the facts as stated in the information, prays the court to restore him to his rights as a member of said committee, to the end that he may perform and discharge the duties to the public required of him under the provisions of law.

To this information there is interposed by respondents a motion to quash. The grounds upon which this motion is predicated, in its last analysis, may thus be briefly stated:

1st. That the facts as charged in the information are insufficient to authorize this court to award the relief prayed for. In other words, the information fails to allege such a state of facts as would warrant this court in issuing its writ of mandamus. That is, that mandamus is not the remedy applicable to the facts stated in the information.

2nd. The constitutionality of the act from which the proceeding emanates is challenged, and it is charged that the act is violative of numerous provisions of the Constitution, which are fully set forth in the motion to quash.

3rd. Numerous other grounds are alleged why this information should be quashed, but it is apparent that when analyzed they are clearly expressed within the broad allegation that the facts as stated are insufficient to authorize the granting of the relief prayed for. In other words, it is a mere direction of the attention of the court to the specific reasons why the facts alleged in the information do not constitute a cause of action and are insufficient to entitle the relator to the relief sought.

This substantially constitutes the record in this proceeding, and there is nothing remaining for this court to do except to give expression to its views upon

the legal propositions disclosed by the record before us.

## OPINION.

It is apparent from the disclosures of the record now before us that the overshadowing proposition with which we are confronted is the one in which the sufficiency of the facts alleged in the information to authorize the relief sought is challenged. The contentions of learned counsel representing relator and the respondent, as applicable to this main proposition, may thus be briefly stated:

*First.* On the other hand the respondents insist that this central committee is a mere voluntary organization and have full power to make and enforce rules as indicated in the information, that is, the absence on the part of committeemen from three consecutive meetings of such committee shall afford sufficient reason for the expulsion of such committeeman, and having the power to create a vacancy under such rules, they also have the power to fill such vacancy by the appointment of some one instead of the expelled member.

On the part of the relator it is earnestly contended that the act of the General Assembly, approved March 13, 1901 (Laws 1901, p. 149), applicable to primary elections in cities of three hundred thousand inhabitants and over, providing, at such primary election, for the election of central committeemen, gives such committee a legal status and that its standing as a political body is materially changed by virtue of the provisions of that act, and under its provisions they have no power conferred upon them to expel any member of the committee or to fill any vacancy created by such expulsion. That the powers to be exercised by such committee must be in harmony with the provisions of that act, and that they have no power to do any

act which is contrary to or inconsistent with it or of any other law of this State.

*Second.* It is insisted on the part of the respondents that upon the facts alleged in the information mandamus is not the proper and appropriate remedy for the relief sought upon the allegations in the information. On the other hand, it is insisted on the part of the relator that upon the facts disclosed by the information mandamus is the only adequate remedy of which relator can avail himself.

*Third.* It is contended by the respondents that the position of the relator as committeeman from the sixth ward is not such a public position with sufficient official characteristics attached to the discharge of the duties of the place as would warrant the court to issue its writ of mandamus restoring him to the exercise of his right to perform and discharge the duties incumbent upon him by virtue of the position. On the other hand, the relator insists that the position of committeeman from which he was illegally expelled is one requiring the performance and discharge of duties in which the public are concerned; that the law-making power by the act of the General Assembly of 1901 created such position and expressly provided for the election of the incumbent and imposes upon such incumbent the performance and discharge of certain functions in which the public are materially interested.

These are the vital questions with which this court is confronted in this controversy, and the rules of law applicable to such questions should not and will not be relaxed in order to justify the issuance of the writ, and on the other hand they should not be extended in order to avoid the issuance of such writ; but the correct solution of the legal propositions with which we are confronted must be sought alone upon a fair and impartial interpretation of the law applicable to

them and upon such interpretation our final conclusions must be predicated.

The consideration of the first proposition, that is, concerning the power to expel the relator, necessitates a brief reference to the nature and character of the Act of the General Assembly approved March 13, 1901. It is obvious from an analysis of the provisions of that act that the lawmaking power fully recognized the importance of the primary election provided for by the act. This act was made applicable alone to cities of three hundred thousand inhabitants or more. The General Assembly manifested their full recognition of the importance of the primary law enacted, which is now under consideration, by modeling it along the same general lines applicable to general elections in this State. An examination of that act will indicate that the lawmakers had in mind the safeguarding of the rights and privileges of the electors in the expression of their will at the polls. The primary elections under this act are under the supervision of the same officers, that is to say, the election commissioners of the city having a sufficient population to act under the provisions of the primary law, as is provided in the conduct and management of general elections for the election of officers of this State. Strict rules are fully provided for by this act for the registration of electors and the manner and method of voting, as well as fully providing for penalties for any violation of the provisions of this law either by the voter or any of the officers connected with it. In fact no one can read the provisions of this law and escape the conclusion that the General Assembly fully recognized the equal importance of primary and general elections and proceeded along lines at least approaching the strictness of the provisions applicable to general elections held under the laws of this State.

The first section of this act in no uncertain terms

indicates the purpose of the General Assembly in the enactment of the various sections embraced in this act, and clearly indicates the nature and character of the evils which were sought to be remedied by such provisions. Section one provides that "the short title of this act shall be the 'Primary Election Law.' Except as otherwise herein provided it shall be controlling: (1) On the methods of the registration of voters in cities in this State which now have, or which may hereafter have, over 300,000 inhabitants according to the last preceding census; (2) on the conduct of primary elections in such cities; (3) on party conventions in such cities, or for any political subdivision thereof; (4) on the choice in such cities, or in any political subdivision thereof, of the members of political committees."

Section 21, subdivision 1, provides that "each party shall have a general committee for each county to which this act is applicable, and the city of St. Louis shall be construed as a county for the purposes of this act. . . . All members of general committees, including congressional and senatorial district committees, chosen in and for any city or district to which this act is applicable, shall be elected biennially at the primary elections on the day of primary for nominating candidates, or electing delegates to delegate convention to nominate candidates for circuit judge, sheriff, and other county officers."

Subdivision 2 of section 21 provides that "the rules and regulations of parties and of the conventions and committees thereof shall not be contrary to or inconsistent with the provisions of this act, or of any other law of this State, and shall not be amended except upon reasonable notice. Every political committee shall, within ten days after its organization, file with the election commissioners a certificate specifying the names and addresses of its chairman and sec-

retary. If any change shall thereafter be made as to either of said officers, a like certificate shall be filed with said commissioners.''

Under the provisions of section 12, whenever an official primary is called, the election commissioners shall forthwith prepare a notice of such official primary election and shall publish such notice for at least three days prior to such primary election in at least one newspaper, having a general circulation in the city in which such primary is held, of the political faith of the party calling such primary. Such notice shall specify the day of such primary election, the hours during which it shall be held, the location of each polling place, the election precincts whose electors may vote at each such polling place, the name of the party whose primary election will be held thereat, and the conventions, committees and officers for which delegates, members or candidates as the case may be, will be voted for thereat.

This we deem a sufficient indication of the nature and character of the provisions of the statute that have any application to the legal propositions involved in this proceeding. No one can read the provisions of this act now under consideration and escape the conclusion that the controlling features of it were, in the main, copied from a statute of New York of 1896, which was carried into the revision of the statutes of New York of 1901, vol. 4, page 4331. This was the view taken of this statute by our esteemed associate Judge VALLIANT in State ex rel. v. Reynolds, 190 Mo. 583. It was there said that "the act appears to have been, in the main, copied from the statute of New York of 1896, which has been carried into the Revised Statutes of New York of 1901.''

At the time of the enactment of our statute the New York statute, from which, as heretofore suggested, ours was borrowed, upon the identical propositions

involved in this proceeding had been construed by the
Court of Appeals of the State of New York in the case
of People ex rel. Coffey v. Democratic General Com-
mittee of Kings County, 164 N. Y. 335; hence, the con-
struction placed upon that statute prior to its adop-
tion in this State will be presumed to have met the ap-
proval of our Legislature when adopting it.    It was
expressly ruled by this court in Skouten v. Wood, 57
Mo. 380, that in construing a legislative enactment of
another State or of a foreign country, it is a well-
settled practice of all courts to adopt the interpreta-
tion of the law which the highest tribunal of such State
or foreign country have given to it.    To the same ef-
fect is Skrainka v. Allen, 76 Mo. 1. c. 389, where it is
said that it is the settled practice of this court, where
the statute of another State or country is enacted here,
to place the same construction upon such statute that
it had at the time of its adoption received in the su-
perior courts of the State or country from which the
same was taken.    These cases were followed and ap-
proved in Snyder v. Railroad, 86 Mo. 613, where it
was held that one of the sections of our statute was
adopted with the construction given to it by the courts
of New York.

In the very recent case of Knight v. Rawlings, 205
Mo. 1. c. 433, Judge Gantt, speaking for this court, in
harmony with its former repeated rulings, said: "Now
it is familiar doctrine that when the statute of another
State or country is adopted by the Legislature of this
State, the construction placed upon that statute prior
to the adoption in this State, will be presumed to have
met the approval of our Legislature when adopting
it."

It is obvious if those cases are to be longer re-
garded as announcing the correct rule of construction
of statutes in this State, which were in the main bor-
rowed from another State, and which had been con-

strued; by the highest tribunal of the State from whence it was imported, it is manifest there is no escape from the conclusion that this statute which we are now discussing, which in substance was borrowed from the State of New York, must receive the same interpretation given by the highest tribunal of that State prior to its adoption in this State.

Chief Justice PARKER, of the Court of Appeals of the State of New York, announced the conclusion in People ex rel. Coffey v. Democratic Committee, supra, and in assigning a reason for the enactment of the statute under discussion and the evils sought to be remedied by such legislation, reviewed numerous enactments of the Legislature of New York, which sought in a measure to protect the rights of a voter in the selection of candidates of his party. He finally concludes his discussion of that part of the case by saying: "While these provisions reduced to a considerable extent the wrongs which had been committed against the voter who desired to participate in the selection of the candidates of his party, and made snap caucuses impossible and the selection of delegates by brute force extremely difficult, still the right of the general committee to prescribe tests or qualifications for a voter was in some instances so employed as to exclude from participation in the primary many who were not in sympathy with the majority of the committee in all respects, and who might be termed members of a minority faction of the party. The not unnatural desire of the several general committees to perpetuate their power and control led, in some instances, to the making of 'regulations' under which members who were not congenial to the majority were disciplined upon charges of disloyalty, inefficiency or mismanagement, and the places made vacant by their removal were oftentimes filled with men who, from choice or prudence, worked in harmony with the ma-

jority or the organization, for the latter term practically means the particular members of a party within a given territory who are, for the time being, in full control of its affairs.'' Judge PARKER then proceeds to discuss the case of McKane v. Adams, 123 N. Y. 609, a case decided under the rules of law applicable to the organization of political committees, prior to the enactment of the statute which is now under discussion. He said, speaking in reference to that case, that ''it appeared that the plaintiff was formerly a member of the Democratic association of his town and a delegate upon the general committee of the county. Charges were preferred against the town association and the trial resulted in its being disbanded. A reorganization of the town association was undertaken and a primary election thereupon ordered by the general committee of the county organization, at which the defendant was elected a delegate to the county committee. The general committee refused to accept the returns of the primary election and to recognize him as a delegate. It was held that membership in such an association is a privilege which may be accorded or withheld. And such being the status of a delegate to the general committee, that body could refuse to recognize the choice of a given constituency until such time as they should conclude to elect a delegate agreeable to the wishes of the majority, thus rendering futile all attempts at independent, otherwise termed 'hostile,' action.''

The learned judge then points out that it was because the abuses indulged in as indicated in McKane v. Adams became so common that a demand was made for a primary election law sufficiently comprehensive in scope to assure to all citizens equal rights in the primary elections, conventions and political committees of the party with which they were allied. In responding to this public demand the Legislature

of New York enacted a statute in which it was sought to remedy the evils which were the basis of such universal complaint under the prior existing laws.    It was that statute so enacted, which was construed by Judge PARKER in the case heretofore suggested, and it was that statute, which in the main, as held by Judge VALLIANT, was substantially adopted by the Legislature of this State, that is now under consideration in this controversy.

In the New York case of Coffey v. Democratic Committee, it was insisted, as it is in the case at bar, that the committee was a mere voluntary organization.    Chief Justice PARKER, in responding to that contention, directed attention to the provisions of the New York statute, which were substantially the same as those contained in section 21, subdivision 1, of the Act of 1901 heretofore referred to, which provides for the creation of the committee and for the election of its members on primary day, and in discussing that proposition he said that "in the first place, the voluntary character of the county general committee has been destroyed, for the statute expressly commands that 'each party shall have a general committee for each county.'    There is but one way to gain membership, says the statute, and that is through the suffrages of the members of the party exercised 'at the primary elections on the annual primary day' and at 'public expense.' "

Subdivision 4 of section 19 in the Act of 1901 enacted by the General Assembly of this State expressly provides that after the result of the primary election is declared, if that election involved the election of a committeeman, it is the duty of the election commissioners to issue a certificate of election to such person receiving the highest number of votes for committeeman in the ward or district in which such person was a candidate.

After calling attention to some of the provisions of this statute which provided for the election of the committeeman, Judge PARKER makes this significant inquiry: "Does the recital of these provisions suggest that the Legislature intended that the committee should be the judge of the election or other qualifications of its members, or that the primary voters should be the judge? What was the object of the legislation—to protect the majority of the committee from enforced association with a disagreeable or 'hostile' member, or to protect the right of the voters to have their wishes in party matters presented by their chosen representatives? If the former, then legislation was not needed in that direction, for the general committee had a method of ridding themselves of offensive members, that was in full operation, as the McKane case witnesseth. If the latter was the object of the Legislature, it is difficult to conceive how it could have taken more effective measures for its certain accomplishment. It provided that the statute should control not only the choice but also the conduct of political committees. The choice of the member is vested absolutely in the voter at the primary, reserving no voice whatever in the matter of his associates in the committee. It provided many things for the conduct of the committee, but the right to expel a member was not one of them."

Judge PARKER, who was speaking for a majority of the Court of Appeals of New York, in emphasizing the correctness of his position that the committee under the provisions of the statute had no power to expel any of the associate members, and that the lawmaking power never intended that they should have, in discussing the statute, said: "But, to resume again the inquiry we were pursuing, whether it was possible for the Legislature to have employed language more apt than it did to absolutely vest the power in the voters

at the primary to. select a representative in the general
committee who should be responsible to them alone for
the manner in which he should conduct himself, we ob-
serve, in addition to the provisions that the statute
should control not only in the choice, but the conduct,
as well, of the committee, that the details of the plan
by which the choice is to be made by the primary voter
are fully carried out and every one of them supports
in some measure the absolute supremacy of the ma-
jority at the primary. The annual enrollment; the
statutory qualification of the voter; the private booth;
the secret ballot and all the expensive machinery of a
general election . . . why was it all required if
the Legislature intended to permit the majority of the
committee to deprive the primary voters of the right
of choice on any ground whatsoever? But it did not
so intend; and, in the light of the abuses that the
Legislature set out to remedy, upon any possible read-
ing of this statute there seems to be no room whatever
for the contention that the right of removal for any
cause was continued in the statutory general commit-
tee that now takes the place of the voluntary commit-
tee of other days."

It will be observed that there was a provision in
the New York statute which authorized the meeting
and making of rules by such committee; it was also
provided that, unless rules were adopted by such
committee under the provisions of this act, the rules
or regulations adopted at the last preceding county or
general committee of such party in such county shall
remain in full force and effect until repealed or
amended in accordance with the provisions of this act.
The last preceding general committee prior to the en-
actment of the statute which the New York court had
under consideration, had a rule providing, under cer-
tain circumstances, for the trial and removal from of-
fice of members of the committee. It was earnestly

insisted in that case that under that provision of the statute the committee had the power conferred upon it to expel members. In responding to that insistence it was held that such rule would be in conflict with both the manifest purpose and clear reading of the statute, and its attention was directed to the provisions of subdivision 2 of the New York statute, which were identical with the provisions of subdivision 2 of the statute of this State, where it is provided that "the rules and regulations of parties and of conventions and committees thereof shall not be contrary to or inconsistent with the provisions of this act, or of any other law." Then followed the conclusion announced by the New York court upon that proposition, that if the respondents were acting under the rules and regulations of its predecessor, so much thereof as provided for the trial and removal from office of a member of the committee has neither force nor effect, because contrary to and inconsistent with the provisions of this act.

It is earnestly insisted and ably argued by learned counsel representing respondents in the case at bar that the provisions of the act of the General Assembly of this State now under discussion fully recognized the right of the respondents to make rules and that the rule affixing the penalty of expulsion of a member for absence without reasonable cause at three consecutive meetings of said committee was a reasonable one and fully authorized by the statute. We are unwilling to give our assent to this insistence. While it is true, under the provisions of our statute, the committee is authorized to make rules, but manifestly the rules contemplated by the act have reference to the details of the management and conduct of the business with which such committee may be confronted. If the provisions of subdivision 2 of  section  21, which recognize the right of the committee to make rules and regulations

of parties and conventions and committees thereof, contemplate the conferring of power upon such body to expel a member, create a vacancy and fill such vacancy by appointment of another, then we confess that the provisions of this statute which undertakes to authorize the voters of the ward or district to select their own representative upon the committee and to protect the voters at the primary in making such selection, are of small effect, and the expression of the will of the electors at the primary elections is certainly very easily thwarted, and the provisions of the statute, notwithstanding the strict rules provided for the conduct of the primary, are absolutely meaningless and without any force and vitality.

Our attention is directed to the rules enforced in legislative bodies, where the right to expel members is often exercised. In responding to that suggestion it must not be overlooked that such bodies are acting upon an express provision of the Constitution or statute which makes such bodies the judges of the qualifications of its members. The provisions of our statute upon creating political committees and providing for the election of the members thereof may be searched and carefully analyzed, and it will be found that there is an entire absence of any provision which gives authority to the members of such bodies to judge of the qualifications of their associates, or in any manner undertakes to confer powers upon such committee to set aside and hold for naught the expression of the will of the electors at a primary election by expelling the chosen representative of such body by the electors at such election.

In arriving at the intent of the Legislature in recognizing, by the provisions of subdivision 2, the right of the committee to make rules and regulations not contrary to or inconsistent with the provisions of this act, some of the provisions of that subdivision are

quite significant. The primary elections provided for by the provisions of this act, as before stated, are under the supervision of the election commissioners, and it is essential that the election commissioners should at all times be aware of the names of the chairmen and secretaries of such committees, as well as the names of the members of the committee representing the respective wards and districts of the city. The committeeman has the right to file delegations from his ward and suggest and recommend the names of judges and clerks to the election commissioners. The chairman of the general committee or the committee representing the district in such city may officially call a primary; therefore it is manifest that the election commissioners should at all times be aware of the names of the persons composing the general committee, as well as the names of the chairman and secretary of such committee, for the reason, if a member of a committee representing a certain ward should suggest the names of the judges and clerks, the first thought that would occur to the election commissioners would be as to whether or not he was a member of the committee from that ward. That would be the first thing to be determined before the suggestions could be at all considered.

Recurring to the provisions of subdivision 2 of the Act of 1901, it will be observed that the law not only prohibits the making of any rules or regulations contrary to or inconsistent with the provisions of this act or of any other law of this State, but in addition it prohibits the amendment of any such rules except upon reasonable notice. It also provides that within ten days after its organization the committee shall file with the election commissioners a certificate specifying the names and addresses of its chairman and secretary. It will be noted that it does not require any certificate as to the names and addresses of the mem-

bers of the committee, doubtless for the reason that the records of their office show the membership of such committee by reason of the fact that the certificates of their election under the provisions of the act had to be issued by the election commissioners. The names of the chairman and secretary were required, doubtless, for the reason that the election commissioners were not presumed to know the names of the persons that the committee would select to fill its offices, that being a matter which would occur upon the organization of the committee and subsequent to the primary election. It then provides that if any change shall thereafter be made as to either of such offices, that is to say, the chairman or secretary of such committee, a like certificate shall be filed with such commissioners. Now, if this committee had the power to expel members and fill vacancies thus created, it is certainly very important that the election commissioners, who have the supervision of the committeemen representing the various wards in the conduct and management of the primaries, are to have some sort of a notice of such change of membership in that body. The general committee have the power to make changes of their chairman and secretary, and the provision is made to notify by certificate of such changes; but the statute is absolutely silent as to any notification to the election commissioners who have to deal with the committeemen representing the respective wards as to any information of any changes made in the committee different to those to whom the certificates of election were issued by such commissioners. There can be but one valid reason for the silence of the provisions of the statute as to any change in the membership of the committee, and that is that the lawmaking power never intended, and it is not so recognized by the statute, that there should be any changes or any power to change the membership of such com-

mittee, but it is fully recognized that the membership of such committee shall be composed of such persons as were selected by the voters at the primary elections in the respective wards of such city, and that as to the names of the members of such, the election commissioners had full notice by reason of the fact that the certificates of their election emanated from such commissioners.

In State ex rel. Rudolph v. Witthoeft, 117 Mo. App. l. c. 627, Judge Goode of the St. Louis Court of Appeals, who wrote the opinion, in giving expression to his views upon the proposition now under discussion, used this language: "I have no idea that the majority of a political committee, at least in the absence of the delegation of power from the voters of the party, can oust from membership a person elected by the voters of the ward, and put a substitute in his place.    Perhaps circumstances might exist which would warrant the exclusion of a committeeman from meetings of the committee, such as a known betrayal of the committee's secrets and hostility to the party's success.    But even the exclusion from meetings and refusal to permit a member to participate in the business and councils of the committee, is made subject to judicial review by our statutes.    The law was designed, among other things, to prevent factional oppressions and outrages in politics, and to lift party management to a plane where it will assist, rather than hinder, the expression of the will of the people in choosing party candidates for public offices and in elections.    Factional party majorities no longer can do as they please, but must recognize and respect the rights of minorities."

It is true that the statute of this State now under discussion is somewhat different in some of its provisions from the New York statute.    Our statute provides that the provisions of the primary law shall be

controlling upon the choice of the member of the committee; while the New York statute contains this same provision there is added that it shall be controlling upon the choice as well as the conduct of political committees.   Upon this difference in the provisions of the statute in the respect suggested learned counsel for respondents have predicated a strong and we must confess a very ingenious argument.   It is insisted that the omission of the provisions respecting the conduct of the committee from our statute destroys the force of the decision of the New York Court of Appeals in that our General Assembly intentionally made this omission and for that reason the construction placed upon the New York statute by the Court of Appeals of that State loses its force and has no application to the proper construction of our statute with the words suggested omitted, and in no way should be taken as a guide in determining the question as to the proper construction to be placed upon our statute.   In other words, the contention of learned counsel for respondents, in its last analysis, simply means that, notwithstanding the Act of the General Assembly of 1901, which is now under consideration, provided that the provisions of such act should control in the choice of the member of the committee, yet having failed to provide that it should also control the conduct of the committee, this omission left it open to the committee, whose choice could only be made under the provisions of this act, to make such rules and regulations respecting the conduct of the committee, as to it might seem proper and appropriate, to the extent of providing for the expulsion of members for acts which might be esteemed wrongful acts.

With all due respect to the learning and ability of counsel, this contention, as well as the argument predicated upon it, is manifestly unsound.   It ultimately leads to the position that the General Assem-

bly, which creates the membership of the committee, by its failure to provide in the act of creation that the conduct of the committee should be controlled by its provisions, meant that such committee is authorized to make such rules and regulations for the control of the conduct of its membership as it may deem proper. This in our opinion is illogical, and followed to its final analysis can mean nothing else except that the failure of the Legislature to confer upon a committee it has created certain definite powers, or a failure to limit the exercise of powers of such committee, is to be made a basis for authority to such committee to define its own powers, exercise them in the manner and to the extent it may deem proper and appropriate, notwithstanding there is an entire absence from the provisions of the statute which created the committee of any power conferred upon it to exercise such powers.

Recurring to the proposition as to whether the General Assembly of this State in the enactment of our statute approved the construction as placed upon the statute of New York from which ours in the main had been borrowed, it must not be overlooked that it is not essential, in order to fall within the rules announced in the cases heretofore indicated upon that proposition, that the statute adopted in this state should be a literal copy of the one from the foreign State, but it is only necessary to bring it within the rules as heretofore suggested that the substance of a statute or some controlling word has been borrowed from such foreign State and adopted by the Legislature of this State.

In State v. Chandler, 132 Mo. l. c. 161, it was said by this court, that "when a statute or controlling word in a statute has received adjudication in the State where the statute originated, and that statute in substance, or its controlling word, has been adopted in an-

other State, it will be presumed that it was adopted with the meaning which had theretofore attached to it in the State of its origin.''

Take the provisions of subdivision 1 of section 21, which provides that each party shall have a general committee for each county to which this act is applicable. That language is literally copied from a section of the statute construed by the Court of Appeals of New York. Construing that language with the other provisions for the election of the committeeman, it was expressly ruled by the highest tribunal of the State of New York, from which the provisions of that statute were borrowed, that by such provision the voluntary character of the county general committee has been destroyed, and there was but one way to gain membership to such committee under the provisions of that statute and that is through the suffrages of the members of the party exercised at the primary election upon primary day. Now, can it be said that this court is not bound by the construction placed upon the provisions of that statute, from which ours is borrowed? We think not. If so the repeated announcements of this court that where a statute or the substance or the controlling words of a statute have been borrowed from a foreign State and adopted by the General Assembly of this State and after it had been construed by the highest tribunal from which it was borrowed, it is presumed that it was adopted with the construction placed upon it by the highest court of the State from which it emanated, should be expressly overruled and no longer followed.

The same may be said as to the provisions of subdivision 2, which provides that the rules and regulations of parties and of the conventions and committees thereof shall not be contrary to or inconsistent with the provisions of this act or any other law of this State. This identical language was borrowed from

the statute of New York, which was construed by the Court of Appeals of that State. A careful analysis of the New York case will demonstrate that the court regarded that the provision that the choice of the members of the committee should be controlled by the provisions of the primary act, was among the leading controlling provisions of that law, and the very language of our primary act which provides that the provisions of our statute shall control in the choice of the members of political committees, was borrowed from the New York statute.

That the Court of Appeals of New York regarded the provision as to the choice of the members of the committee as being one of the controlling provisions, it is only necessary to point out some of the expressions used by Judge PARKER in discussing the provisions of that statute. He said, referring to the statute, that "the choice of the member is vested absolutely in the voter at the primary, reserving no voice whatever in the matter as to his associates in the committee." He again said, referring to the statute, "There is but one way to gain membership, says the statute, and that is through the suffrages of the members of the party exercised at the primary elections on the annual primary day." Again, referring to the views entertained by him upon the subject in hand, he said: "If I am right in the views expressed, no other question need be considered, for the statute manifests an intent not to allow the committee on any pretext whatever, to remove the committeeman from office, and it is the duty of this court to give full force and effect to that legislative intent."

It is clearly manifest that the learned judge in construing the provisions of the statute, which provided that the rules and regulations made by the committee should not be contrary to or inconsistent with the provisions of this act or any other law of this

State, predicated his conclusion that the committee had no power to enforce the rule which authorized them to expel a member upon the ground that such a rule was contrary to and inconsistent with the provisions of the statute which provides that the choice of the committee should be controlled by the provisions of the primary act.

It will not be disputed that this committee was created by the provisions of section 21, subdivision 1, of our statute; nor will it be seriously contended that this section of our law was not borrowed from the State of New York, for it is plainly obvious that it was, and it was so borrowed with the construction placed upon it by the highest judicial tribunal of that State; hence, it must logically follow that this section of the statute, having been construed by the court of the State from which we borrowed it, if we follow our decisions we must adopt the same construction. This being true and the section creating this committee having been construed as changing the voluntary association feature in the organization of the committee, it logically follows that such committee is possessed of only such powers as are conferred by the statute creating it.

It is fundamental that no organized body composed of individuals can make or enforce any rules or regulations concerning such body that are contrary to or inconsistent with the laws of its creation. Nearly all the trial courts of this State have a system of rules pertaining to the disposition of business that may be transacted in such courts, but it has been repeatedly held by this court that such courts were not authorized to make or enforce any rules in violation of the provisions of the statute.

A great deal of alarm is expressed by counsel for respondents that if the conclusion reached by the New York Court of Appeals is followed by this court the

210 Sup—11

political parties would suffer by having no representative in some of the wards of the great cities of this State. It is sufficient to say that in our opinion the committeeman of the political party he represents falls far short of constituting the entire party that he purports to represent. Even though a ward may be without a committeeman, it does not mean that party interests will be entirely neglected in that ward, for we take it that as long as there are people residing therein who belong to a political party for the love of its principles, the interests of the political party to which such persons belong doubtless will not suffer. It must not be overlooked that the efforts of good citizenship, aroused by an earnest and genuine patriotism, may and can accomplish results which materially aid the party it favors.

If under the provisions of our primary act the general committee provided for has the power to make and enforce rules by which any associate member may be expelled, then truly may it be said that the Legislature enacted a meaningless provision when it provided that such committeeman should be selected by the people at the primary elections in their respective wards on primary day. If that is the correct interpretation of this law, it simply means that the voters of a political party in any designated ward of the city of St. Louis may elect as a member of the committee from such ward a voter and citizen in whom they have absolute faith and confidence, both in his integrity and ability to represent said ward, and the next day the persons composing a majority of such committee may introduce and adopt a resolution expelling him from such committee, thereby depriving him of the right to perform and discharge the duties imposed upon him by the electors in his particular ward. If this can be done and the committeeman deprived of his right to represent his people and his party he will then be ab-

solutely without any remedy to be restored to such rights. If they have the power to expel upon charges being preferred, it makes no difference as to what the proof of those charges may be, for a writ of *certiorari* would only bring up the record and no part of the proof; therefore, if the charges were regular the presumption would have to be indulged that the majority members of the committee had decided correctly according to the proof introduced upon such charges. In other words, it simply means that, so far as concerns the selection of the general committee in cities in which this primary act is applicable, the choice of the selection of such committee must always be in harmony, not with the sentiment and voice of the people of the wards they represent, but simply in harmony with the majority members composing it, and those members who are elected by the people of their respective wards who are not in harmony with the majority of the committee, and willing to act along the lines that they suggest, will be looked after by the enforcement of a rule which authorizes the expulsion of such members.

The same argument was advanced in the New York case, that it would be detrimental to party interests to hold that a majority of the general committee did not have the power to expel associate members. The distinguished jurist who wrote the opinion in that case for the majority of the court, in responding to such contention, made this very appropriate answer. He said: "It has been suggested that it would be intolerable for the members of a general committee to associate with a member who is hostile to the ticket, and that it follows that the Legislature must be presumed to have had such a situation in mind. I answer—without assenting for one moment that the legal conclusion follows from the proposition of fact standing alone—that it does not stand alone; that the Legislature was confronted with what it regarded as an abuse

of the rights of the citizens in party matters, which compelled it to decide which was the lesser of two evils, to compel association occasionally with a member who is hostile to some portion of the party candidates or a majority of the committee or to permit the general committee to deprive the primary voters of the choice of a representative.. It decided that the wrongs that had been and were being done to the primary voters exceeded that which could result from occasional association with a hostile member. In other words, it was determined that the majority of the primary voters were entitled to select any representative they might desire, who should be responsible to those electing him, and only to them, for his conduct in office. That determination should be given effect by the decision of this court agreeably to that well-understood canon of construction that commands the court in construing a statute to give effect to the intention of the Legislature.''

In our opinion the enactment of the primary law approved March 13, 1901, was for the purpose of remedying similar complaints urged against the organization and conduct of political committees, as stated in the New York case, and the General Assembly of this State sought by this enactment to place the selection of the committeeman in the hands of the people to whom alone the committeeman was responsible for his conduct, in representing the electors by whom he was chosen. Our statute in most of its substantial features was borrowed from the statute of New York, which had been construed, as heretofore pointed out, by the Court of Appeals of that State prior to its adoption in this State, and we repeat that if the cases as heretofore suggested are to be followed, then there is no escape from the conclusion that our statute upon the proposition now under discussion must receive the same construction as that given by the New York court

and it must be held that the general committee provided for by our primary act has no power conferred upon it to expel any member of such committee.

## II.

This brings us to the consideration of the second proposition disclosed by the record in this cause, that is, whether or not *mandamus* is the appropriate remedy for the relief sought upon the facts disclosed in the information. It is insisted by counsel for respondents:

*First.* That the relator is not a public officer, therefore the remedy by *mandamus* is not open to him.

*Second.* That if he is a public officer the record discloses that Mr. Garvey is in possession of the office and therefore the title to such office cannot be determined by writ of *mandamus.*

In our opinion it is immaterial as to what you may denominate the position of the relator. If the duties imposed upon him either make him a public officer or a quasi-public officer, or if the position is one wherein he has the right to perform the duties and functions required of him, and the matters about which he performs the service are those of public concern, or if the position is one with such characteristics as to make it analogous to that of a public office, then he has the right to invoke the remedy by writ of mandamus for the purpose of restoring him to the rights of which he has been illegally deprived. Upon this proposition the law is well settled. In Cooley's Blackstone (4 Ed.), vol. 2, we find a very clear announcement of the rule applicable to the office to be performed by the writ of *mandamus.* In discussing this extraordinary writ is is there said: ''It is a high prerogative writ, of a most extensively remedial nature; and may be issued in some cases where the injured party has also another more tedious method of redress, as in the cases

of admission or restitution to an office; but it issues in all cases where the party hath a right to have anything done, and hath no other specific means of compelling its performance. A *mandamus* therefore lies to compel the admission or restoration of the party applying to any office or franchise of a public nature, whether spiritual or temporal.''

Mr. High, in his work upon Extraordinary Legal Remedies (3 Ed.), sec. 67, in discussing this question, states the rule of law in this language: ''We have already seen that the courts refuse to lend their extraordinary aid by *mandamus* to determine disputed questions of title to office, or to compel the admission of a claimant in the first instance, when he has never been in possession of the office or exercised its franchises. When, however, one has been in the actual and lawful possession and enjoyment of an office from which he has been wrongfully removed, a different case is presented. And mandamus is recognized as a peculiarly appropriate remedy to correct an improper amotion from a public office, and to restore to the full enjoyment of his franchise a person who has been improperly deprived thereof.''

To the same effect is the announcement of the rule in Merrill on Mandamus. It is there said that when an officer has been wrongfully removed from his office he will be restored thereto by the writ of *mandamus*.

Mr. Bailey, in his treatise upon the subject of Jurisdiction, is in perfect harmony with the rules announced in Blackstone and in High's Extraordinary Remedies. He says that *mandamus* is the appropriate remedy to restore a public officer to the office from which he has been wrongfully removed. However, he says a distinction is drawn between those cases where a person seeks to be inducted into an office where he has been duly elected and those where he has been

actually inducted into an office and seeks to regain it.

Spelling, in his treatise upon the subject of Injunction and Other Extraordinary Remedies (2 Ed.), vol. 2, sec. 1576, states the rule with remarkable clearness: "Mandamus is the proper remedy to restore one to the full enjoyment of an office or position of trust and emolument of a public nature from which he has been wrongfully removed, or which is wrongfully withheld. There is an important distinction to be taken between cases where *mandamus* is sought to induct a claimant into an office already filled, and those where one actually in office has been removed or deprived of his rights and privileges therein. In the former cases, as has been shown, the incumbency of another under such color of right as constitutes him an officer *de facto* rather than a mere intruder will be a complete answer to the petition; but where one has been wrongfully deprived of an office by the illegal appointment of another, *mandamus* will issue to effect his restoration, even though such appointee be in possession *de facto*."

The overwhelming weight of authority as expressed by the appellate courts of numerous states where this proposition has been in judgment before them is in harmony with the rule as announced by the eminent text-writers heretofore indicated.

In Ex parte Lusk, 82 Ala. 519, that court, in discussing this proposition, said: "While mandamus will not be awarded to try a disputed title to an office, it is well settled that it is an appropriate remedy to compel the restoration of a rightful incumbent, who has been wrongfully deprived of the enjoyment of official privileges by removal or suspension," citing Ex parte Wiley, 54 Ala. 226; Ex parte Diggs, 52 Ala. 381; High on Ex. Rem., sec. 67; Weatherly's Case, 75 Ala. 248.

To the same effect are the cases of Lewis v. Whittle, 77 Va. 415; State ex rel. Gill v. Common Council, 9 Wis. 254; Miles v. Stevenson, 80 Md. 358; Metsker v. Neally, 41 Kan. 122; Eastman v. Householder, 54 Kan. 63; People ex rel. v. Ahearn, 98 N. Y. Supp. 492; Pratt v. Board, 15 Utah 1; Ransom v. Mayor of Boston, 79 N. E. 823; Com. v. Primrose, 2 W. & S. 407; Com. ex rel. v. Gibbons, 196 Pa. St. 97; Zulich v. Bowman, 42 Pa. St. 83.

This court, in St. Louis County Court v. Sparks, 10 Mo. 118, gave expression to its views upon this proposition, and while it was held in that case that *mandamus* was not the proper remedy, yet it was expressly ruled that *mandamus* may be issued to restore a person to an office to which he is not entitled. In that case Sparks was by the proper authorities appointed collector, to hold for one year, and until his successor was appointed. At the end of the year another was appointed to the office, who, Sparks claimed, was not eligible. Sparks sought to hold over, but was ejected and brought *mandamus* for restoration. This was a case where the title to the office was involved; it being filed by one who was in by color of right. The incumbent was in by appointment as provided for by law, the only question being as to his personal qualification. He was clearly a *de facto* officer with color of right. In discussing the proposition it was said by this court in that case, that, "it has long been held that a *mandamus* may be issued to restore a person to an office to which he is entitled. [4 Bacon 500.] But we are not prepared to say that this was a proper case for the interference of the circuit court by *mandamus*. Various considerations incline us to this opinion. The office was already filled by one who was *de facto* an officer, at least; and it appears to be law 'that when an office is already filled by a person who is in by color of right, a *mandamus* is never issued to

admit another person, the proper remedy being an information in the nature of *quo warranto*. It would not be just that Wise's right to the office should be determined on a proceeding to which he was no party.'"

We fully agree with counsel for respondents that you cannot litigate and determine the title to an office by a writ of *mandamus,* but it is manifest that in this proceeding the title to the position to which relator seeks to be restored is in no way involved. The mere claim to an office by one whose claim is not based at least upon a reasonable color of right, or where a person is simply an intruder into the position, by no means puts the title to the office in issue, and such a state of facts falls far short of being sufficient to prevent the issuance of the writ of *mandamus* to restore a party who has the right to discharge the duties and functions of a position to which he is legally entitled. In this proceeding we have in the first paragraph of this opinion given expression to our views upon the subject of the power of the committee to expel the relator and the conclusions therein reached was that there was no such power. If there was no power to expel, it logically follows there was no vacancy created; hence, none to be filled; therefore, the efforts of the committee to fill such pretended vacancy by the appointment of Garvey was an absolute nullity.

Mr. Spelling, in his work heretofore referred to, it will be observed from the quotation made, expressly lays down the rule that the incumbency by a party in possession of an office under such color of right as constitutes him an officer *de facto,* rather than a mere intruder, will be a complete answer to a petition for *mandamus;* but he clearly points out the distinction that "where one has been wrongfully deprived of an office by the illegal appointment of another, *mandamus*

will issue to effect his restoration, even though such appointee be in possession *de facto*."

Discussing this proposition we find in 26 Cyclopedia of Law and Procedure, 264, this reference to this proposition: "According to the prevailing rule the doctrine allowing the writ of *mandamus* to compel the restoration of an officer illegally removed applies, although the office is subsequently filled by another, where the office has been filled by proceedings palpably without legal warrant or where the facts before the court or within its judicial knowledge show clearly that the relator who was removed was in office *de jure et de facto,* and that defendant while claiming to be in *de facto* can make no claim to be in *de jure.*"

In Com. ex rel. v. Gibbons, 196 Pa. St. 97, the proposition in judgment before the court was as to the reinstatement of a school director whose expulsion had been attempted on the ground that he failed to attend meetings. That court, in discussing the proposition now under consideration, said: "It is very earnestly argued by appellants that *mandamus* will not lie, and that the only remedy is by *quo warranto* against the person elected to fill the supposed vacancy. It would be sufficient answer to cite the precedent of Zulich v. Bowman (42 Pa. St. 83), but the remedy is clear on principle. There is no contest as to the relator's original title to his seat under a valid election, but only as to the legality of his ouster. If this was not valid, he never has been ousted at all, and *mandamus* is the proper remedy to prevent his further unlawful exclusion. We have nothing to do with the title of his alleged successor who was apparently elected by the board to fill a vacancy that did not exist. This cannot affect the relator. He was immediately elected to the office, has never been out of it in contemplation of law, and the *mandamus* simply compels the respondents to recognize his established right."

The rule of law applicable to this proposition is nowhere more clearly or tersely stated than in State ex rel. v. Patterson, 35 N. J. L. 190. In that case, as in the case at bar, it was suggested that *mandamus* was not the proper remedy. The court, in disposing of the contention urged, said: "Objection was raised to the use of the writ of *mandamus* in this case, because it was said that James Dunn is in office by color of right, and the court will not, therefore, admit another person who claims to have been duly elected. The proper remedy is by information in the nature of *quo warranto*. [People v. New York, 3 Johns. Cases 79.] But this is not the case of attempting to oust from office by *mandamus* a person who is in by color of right. There is no right here. The pretended appointment is a mere nullity. There was no appointing board, and those who attempted to act had no authority. The applicant here is clearly still in office by legal appointment, and the effort is to oust him without legal authority. He has a right to this remedy by *mandamus*."

In People ex rel. v. Ahearn, 98 N. Y. Supp. 492, heretofore cited, it was urged that the party who was occupying the position from which the relator had been removed was a necessary party to the final adjudication of the question. Upon that proposition the Supreme Court of New York announced its views in no uncertain terms. It was there said: "I do not think that the present incumbent of the position, appointed to fill the position from which the relator was removed, is a necessary party to this proceeding to reinstate the relator. While it may be that the present incumbent could be made a party as interested in the result of this proceeding, his presence is not at all essential to a complete determination of the question at issue between the relator and the defendant, the appointing officer. If the relator's removal was illegal, the final

order reinstating him would be a command to the appointing officer; but the relator could obtain no relief in this proceeding against the person who had been appointed to the position from which he had been removed. . . . But in this case the relator was duly appointed and in office. If his removal was illegal, he has never been deprived of his office, and this application is to enforce his right to continue in the office from which he was illegally removed. The person appointed in his place, if he was illegally removed, has no right to the office and never had a right to it.''

We deem it unnecessary to pursue the discussion of this proposition further. In our opinion the adjudications heretofore indicated upon this proposition, according to our views, settle it correctly, and if the relator is in a position to invoke the rules of law as announced in those cases to which we have made reference, then in our opinion he has the right to invoke this writ and is entitled to the relief sought by it.

### III.

This brings us to the consideration of the third proposition disclosed by the record in this proceeding. It is insisted by counsel for respondents that the position to which relator seeks to be restored, or at least in which he seeks to be restored to the right of performing and discharging the duties and functions of such position, is not such a one as falls within the principles announced in the cases heretofore cited, which would entitle relator to invoke the aid of the writ of *mandamus*.

We are unable to agree with learned counsel upon this proposition. As heretofore stated, we deem it immaterial what name should be attached to the position of a membership of the general committee of the city of St. Louis. If the duties imposed upon the committeemen are of a public nature and concern the pub-

lic then in our opinion his position should be classified at least either as a public officer or a quasi-public officer, or a position analogous to that of a public officer.

Mr. Spelling, the eminent text-writer on Injunctions and other Extraordinary Remedies, maintains that *mandamus* is the proper remedy to restore one to the full enjoyment of an office or a position of trust and emolument of a public nature from which he had been wrongfully removed or which is wrongfully withheld.

The Supreme Court of Appeals of Virginia, in Lewis v. Whittle, 77 Va. 415, thus states the law upon that subject: "Wherever there is a right to execute an office, perform a service, or exercise a franchise, more especially if it be a matter of public concern, and a person is dispossessed of such right and has no other specific adequate remedy, then the court ought to assist by *mandamus* upon reasons of justice, as expressed by the writ, and upon reasons of public policy, to preserve the peace, good order and good government."

The case of Ransom v. Mayor of Boston, 79 N. E. 823, was an application by the relator for *mandamus* to compel his reinstatement in the labor service of the city. The court's attention being directed to the proposition as to whether or not he was a public officer, thus disposed of that question in this language: "It is not disputed that when a public officer has been unlawfully ousted from his position, the proper means for him to regain his office is by petition for a writ of *mandamus*." But said the court in that case, "it is already settled that the plaintiff's rights are on a par with those of a public officer."

So we say in this case; it makes no difference whether or not the relator is denominated a public officer; under the law of this State he is elected to fill

a public position and to perform duties of great pub-
lic concern; therefore, his position is one at least an-
alogous to that of a public officer. This proposition
was involved in a proceeding in the Supreme Court
of Kentucky in the case of Mason v. Byrley, 84 S. W.
767. The court in that case in treating the question
said that "the·question under consideration is not one
of party custom, but of law, for, by the enactment
of the statute, it was the purpose of the Legislature
to have primary elections conducted according to law.
. . . While those who constitute the membership
of the governing authority of a political organization
are not officers, in the technical meaning of that term,
the duties required of them by the statute are official
in character, because they must be performed as
therein prescribed." Proceeding with the discussion
of the proposition the court further said that "whether
the members of the district committee be denominated
ministerial officers, or agents of a political organiza-
tion, the duties which they, or a majority of them,
have failed to perform are statutory—that is, such as
are prescribed by the statute regulating primary elec-
tions—and, therefore, in that sense, official duties."

The Supreme Court of the State of Wisconsin has
gone to the extent, where persons are nominated by
primary elections as candidates for office, to denom-
inate the position of the candidate who receives the
highest number of votes at such primary elections as
holding a quasi-office. This was so ruled in State ex
rel. Rinder v. Goff, 129 Wis. 668, where it was said:
"The necessary effect of the primary law is to give an
official character and standing to a man who has re-
ceived the plurality of the votes of his party at a pri-
mary election. It may not be strictly accurate to call
him a public officer, but the law gives him a certain and
definite legal standing, and endows him with at least
one valuable privilege or right which he may enforce.

Until the time of the election he is guaranteed, and in fact holds, a recognized legal position, which may be called, in default of a better term, a 'quasi-office,' namely that of a nominated candidate.''

This court in State ex rel. v. Trent, 58 Mo. 571, fully recognized that there might be positions which could be properly denominated quasi-official stations. In that case the respondent had been employed by the county court of Cooper county to make a survey of all public roads of the county and plat them in a suitable book. He did the work of making the survey and was paid the price for his work in accordance with the contract. Subsequently he regained possession of the books and surveys and refused to deliver the same to the county officials. It was ruled in that case that being a private person the writ of *mandamus* could not be invoked against him and it was said by the court that ''authority has been found, in full accord with our impressions on the argument of the case, that as regards a person holding no official or quasi-official station, *mandamus* would not lie.'' It logically follows from the announcement of the conclusion in that case that, if the respondent had occupied an official or quasi-official station, *mandamus* would be the proper remedy.

That the duties incumbent upon the relator as a member of the general committee of the city of St. Louis are of a public nature and deeply concern the public, we think there ought to be but little dispute. As was said by the Kentucky court, the proposition now under consideration is not one of party custom, but of law. The enactment of the primary law by the General Assembly which is involved in this proceeding, clearly indicates that the purpose of the Legislature was to have a primary election conducted according to law.

Comparatively early in the history of this com-

monwealth experience demonstrated that it was essential, in fact that it was an absolute necessity, to protect by strict laws the rights of the voter at general elections, and in recent years it has become manifest that it is just as essential and important to control by positive enactment the nomination of candidates as to regulate the procedure of their elections at the general election under the laws of this State; hence we can conceive of no matter applicable to our election system, in which the public should be more interested than in the selection of the candidate of the leading political parties, some of whom at least will be chosen to administer the affairs of State and municipal government. It is clear, therefore, that the primary election is the initiative step in the selection of public officials, therefore, we see no escape from the conclusion that the duties of the general committee of the city of St. Louis, which calls the official primary and recommends and suggest the judges and clerks of such primary elections, are not only of an official character, but as well the duties in which the public are deeply interested in having faithfully and conscientiously performed.

The relator in this proceeding is a citizen of the Sixth ward of the city of St. Louis. He was chosen by the Democratic voters of said ward at a primary election to represent such voters upon said committee. His election was strictly in accord with the provisions of the primary act adopted by the General Assembly of this State in 1901. As stated by the New York Court of Appeals, under the provisions of this act, "there is but one way to gain membership, says the statute, and that is through the suffrages of the members of the party exercised at the primary on primary day." The relator gained his membership of this committee in the only way provided by the statute, and it was never intended by the General Assembly to

leave any power in the committee, so chosen by the people, to invoke any sort of a pretext by which such committee could be changed, contrary to and inconsistent with the will of the voters expressed at the primary elections, which was held in pursuance of the act of the General Assembly.

## IV.

Finally the constitutionality of this primary law is challenged. In oral argument learned counsel representing respondents particularly directed their attention to the provisions of section 23 of the primary act, which provides for a review of any action or neglect of the officers or members of a political convention or committee by the appropriate remedy of *mandamus* or *certiorari*. The principal ground upon which this section is challenged was that it was an effort by the General Assembly to change the nature and character of the writ of *mandamus* from that contemplated by the statute of this State at the time of its adoption. In other words, it is insisted that the original writs contemplated by the Constitution of this State were common-law writs.

We deem it unnecessary to discuss this proposition, for the reason that it is manifest from the views heretofore indicated that our conclusion is predicated alone upon the right of the relator to invoke the original writ of *mandamus* as contemplated by the organic law of this State.

The constitutionality of this primary act is challenged upon other grounds, that is, that it is violative of other provisions of the Constitution of this State. However, those grounds were not particularly pressed in oral argument, nor are they urged in the exhaustive briefs filed by the learned counsel in this cause.

We are not inclined to look with favor upon the challenge of respondents to the constitutionality of this

act; if for no other reason than that such challenge upon the disclosures of the record would clearly place the respondents in a peculiarly inconsistent position. In other words, the record discloses that such of the respondents as were elected in their respective wards are only entitled to the positions by reason of the provisions of this primary act, and it is claimed by them that the provisions of such act authorized or at least recognized their power to make rules and regulations which would justify the expulsion of the relator and the filling of the vacancy thus created by the appointment of another in his stead. This simply amounts to an assertion that this primary act is constitutional so far as the powers we undertake to exercise, but that it is unconstitutional when the relator or any one else undertakes to challenge our power.

Our National as well as State government from their earliest history had their contending political parties representing the principles of government that was thought best and most conducive to the perpetuity of republican institutions. All along the history of these political parties there has been some method of selecting candidates, who sought the administration of governmental affairs. It is but common knowledge that in recent years numerous complaints have been made by the people from one end of the nation to the other as to the methods adopted in the selection of candidates for which they were expected to vote at the general elections. This complaint aroused a sentiment, and it was a growing sentiment in favor of the regulation of caucuses and primaries and nominating conventions held for the purpose of selecting candidates, and it is only necessary to observe the enactment of legislation in the various States of this Union regulating the methods of selecting candidates in order to realize that the growing public sentiment has been crystallized.

With the making of this law, or its wisdom, we have nothing to do. If it is a reasonable regulation of the methods of selecting candidates it should be upheld. It may further be added that if this law is a good one and in any way tends to accomplish the purposes sought by its enactment, then it should be strictly enforced. If it is a bad law and materially interferes with the interest of party organization, then the more strictly it is enforced the sooner it will be repealed. That the General Assembly is authorized to enact reasonable legislation providing for the regulation of party primary elections and the election of committeemen and other officials to conduct such election we have no doubt.

The relator in this proceeding was duly elected by the electors of his party in the Sixth Ward. The respondents illegally sought to expel him and deprive him of the right to exercise the functions of the position for which he had been chosen and appoint another in his stead. This in our opinion the respondents had no power to do under the provisions of the law in force in this State.

Having reached the conclusions heretofore indicated, it becomes unnecessary to discuss the remaining proposition concerning the expulsion of the relator under the rule providing for the expulsion of members for absence from three consecutive meetings without reasonable cause, without preferring any charges or giving the relator any notice or opportunity to explain the cause of such absence. It is sufficient to say upon that proposition that if the allegations in the information are true, that he had no notice of any proceeding to expel him, it only emphasizes the correctness of the conclusion reached by the lawmaking power, that it was necessary to enact legislation to regulate the selection of committeemen in cities of three hundred thousand inhabitants or more.

We have herein given expression to our views upon the propositions disclosed by the record, which results in the conclusion that the relator was illegally expelled and is now deprived of the right to exercise the functions of the position to which he was elected by the electors of his ward and that he is entitled to invoke at the hands of this court the aid of the writ of *mandamus*. It is therefore ordered that the motion to quash the information be overruled, and that the alternative writ issued in this cause be made peremptory, and the writ is directed to be issued.

*Gantt, C. J., Burgess* and *Woodson, JJ.,* concur; *Valliant, J.,* dissents and expresses his views in a separate opinion in which *Graves, J.,* concurs; *Lamm, J.,* not sitting.

## DISSENTING OPINION.

VALLIANT, J.—The relator was elected a member of the Democratic City Central Committee for the city of St. Louis in October, 1906, at an election held under the provisions of the Primary Election Law approved March 13, 1901, and entered upon the duties of that office (?) and so continued until the 23d September, 1907, when he was expelled by a vote of the committee for failure to attend three consecutive meetings in violation of a rule of the committee which provided that such failure without reasonable excuse should be cause for expulsion.

This is an application for a writ of *mandamus* to be addressed to the committee commanding them to return the relator to membership.

This case presents a very important question, a very serious one, and the decision granting the writ opens a new chapter in our law to which I cannot give my assent.

Courts sit to decide causes in which either life,

State ex rel. v. Miles.

liberty or property is involved, beyond that they have no jurisdiction. Under the term "property" is included the right to hold a public office, and under the term "liberty" is included the individual rights of citizenship and its privileges. All these rights the courts will protect, but the right to be a member of a mere voluntary committee, whether organized for social, political or religious purposes, is outside the realm of the judiciary. When the government undertakes by its courts to regulate such matters it goes beyond the scope of legitimate free government. Once open up a new road with that vista and there will be no end to it; one step will lead to another. In my opinion we should pause long before we take the first step.

Until the passage of the Primary Election Law in 1901 it was not supposed that a political committee was anything more than a voluntary organization governing itself by its own rules and answerable only in the forum of the public opinion of their fellow-citizens of their party. And until the committee or its members impinged the property rights of an individual or his rights as a citizen the courts had nothing to do with them. It is history which the court knows that for many years each of the great political parties in this State has had its committees, county, district and State, and until in recent years when frequent resorts have been made to the courts, whenever difficulties of the kind now complained of arose, they were taken to the State Committee for adjustment, and there is where all such controversies should go. It is not too much for the court to take judicial cognizance of the fact that in the main the State committees have been composed of men who have had the confidence of their partymen. Such committee can, with so much more expedition and so much better political judgment, determine such matters that its authority should be up-

held. What is the main purpose of a political com-
mittee? It is to manage the political campaign so as
best to promote the interest of the party it represents.
Can we for a moment conceive the idea of a court
controlling the conduct of a political committee so as
best to promote the interest of a political party? In
the management of a political campaign, policy and
expediency are considerations that enter largely into
the counsels of the committees, and it has always been
recognized as the prerogative of such a committee to
make rules for the government of itself and its mem-
bers and under its rules a member is liable to be ex-
pelled if he acts in discord with the policy of the com-
mittee. That is a power that may be abused, but so
also is the power that any voluntary society may ex-
ercise. It would probably not be contended that the
court could reinstate a member who had been expelled
for what the majority of the committee adjudged to
be disloyalty to the party, but the court is now asked
to do an act which, if it has jurisdiction to do, it has
jurisdiction also to review the judgment of a com-
mittee expelling a member for disloyalty, and in so
reviewing the act of the committee the court would be
forced to decide what was the best policy to promote
the interest of the particular political party in ques-
tion in that case and whether the conduct of the mem-
ber was in discord with that policy. If the court has
jurisdiction to decide such a case either way it would
have jurisdiction to decide that the policy of the ex-
pelled member was really the best policy for the party.
When the court should once start out on such a road
where would it end?

I do not say that the General Assembly has not
the power to require political parties to hold their
primary elections in manner prescribed by law; if such
a power exists it probably rests in the police power of
the State government. But I do say that the General

Assembly has no authority to convert a mere voluntary
organization, whether political, social or religious, into
a State institution and clothe its members with author-
ity of State officials.   Even the fact that such com-
mittees have much to do with the election of State
officers does not alter the case.   We have in our large
cities large political clubs which exercise much influ-
ence in general elections, sometimes perhaps even
more influence than the city committee; what would be
thought of an act of the General Assembly undertak-
ing to convert the board of directors in one of those
associations into State officials?

The only clause in the Act of 1901 that is relied
on by relator to give official character to the position
of a political committeeman is in section 21 of the act:
"Each party shall have a general committee for each
county to which this act is applicable, and the city of
St. Louis shall be construed as a county for the pur-
poses of this act."   Our statute is a copy, as far as it
goes, of the New York statute, and under the clause
just quoted it has been held in that State that the
political committee which before the passage of the
act was a voluntary association became, after that act
went into effect, an involuntary association and it was
in the same case held that a member of the committee
who had been expelled should by force of the writ
of mandamus be restored to his membership.   [People
ex rel. v. Democratic General Committee, 164 N. Y.
335.]   There is this difference, however, in this part
of the statute between the New York statute and ours.
The New York statute declared not only that the rules
and regulations of the committee should not be con-
trary to the provisions of the act, as does ours also,
but that the conduct of the committee should be under
the control of the provisions of the act, which ours does
not.   Therefore, if the New York court gave, as it
seems to have given, force to the clause which brings

the conduct of the committee into subjection to the provisions of the act, the decision loses its force with us because there is no such clause in our act, and since ours is such a close copy, as far as it goes, of the New York statute, the omission of that clause from our act signifies that our General Assembly intentionally refused to adopt it. In this connection I will call attention to the fact that at that time in New York they had a statute which we have not which gives to the writ of *mandamus* an office which it does not have in this State and which explains what the New York statute means by "the appropriate remedy of *mandamus*." [Rev. Stat. N. Y. 1901, vol. 1, p. 390.]

And whilst we are on the subject of remedy I will call attention to the fact that the case above cited was in the Court of Appeals on an appeal from the Supreme Court, which in that State is a court having general original jurisdiction. In this State the Supreme Court has no original jurisdiction except that conferred by the Constitution to issue certain original writs, and the General Assembly cannot confer any other original jurisdiction on this court. The original writs mentioned in the Constitution which this court may issue are common law writs or writs having the scope that they had at the time the Constitution was adopted. The General Assembly cannot broaden the scope of those writs so as to make this a trial court or a court of original jurisdiction of causes not contemplated in the Constitution; for example, the General Assembly has no authority to say that under a writ of *mandamus* or *certiorari* this court shall exercise original jurisdiction to try a contested election case.

The New York case above cited was decided by a divided court, Chief Justice PARKER wrote the opinion and three of the associate justices concurred, but the three other justices did not concur. With defer-

ence to the distinguished jurist who wrote the prevailing opinion and of his learned associates who concurred in his views, I feel compelled to say that in my judgment the preponderance of the force of reason and logic, in the discussion, is in the dissenting opinion of Mr. Justice CULLEN. I am tempted to quote from that opinion and wish I felt justified in occupying time and space to quote it all. The learned jurist in part said: "The members of that committee are certainly not public officers, for this reason, if for no other: public officers must, under the Constitution, be either appointed or elected, and if elected, then in the same manner as other elections by the people. [Citing authorities.] They take no official oath. They cannot be indicted and removed for misconduct in office. It is difficult to imagine a case where the obligation of a member to the association is more purely ethical or more devoid of any legal attributes possible to be enforced by the courts. The political convictions of a member may change subsequent to his election and he may conscientiously desire the defeat of the party to which he has belonged. He may think that in no way can he accomplish that result more effectually than by remaining as a leader to share in the counsels and control of the party. Is the committee to be relegated to the chance of the member's sense of delicacy dictating his resignation, as the sole means of severing its connection with him?" Referring to the contention that the statute which declares that "each party shall have a general committee," etc., converts the voluntary association into one not voluntary the opinion continues: "From this doctrine I dissent *toto coelo*. If the statute is to be so construed, in my judgment, it is unconstitutional and void. The right of the electors to organize and associate themselves for the purpose of choosing public officers is as absolute and beyond legislative control as their right to

associate for the purpose of business or social inter-
course or recreation. The Legislature may, doubtless,
forbid fraud, corruption, intimidation or other crimes
in political organizations, . . . but beyond this it
cannot go. . . . The statute of primary elections
grants the right to join in the management of a party
to any person on a declaration of his intention to sup-
port generally the candidates of that party, but a po-
litical organization may be unwilling to grant member-
ship on those terms. It may make past conduct, and
not future promise, the condition of membership. . . .
The rules and principles on which political parties are
to be conducted must necessarily lie largely beyond
the domain of legislative interference, because they re-
late to the action of the people, the ultimate source of
sovereignty in what is unquestionably their preroga-
tive, the election of public officers.''

The case of State ex rel. v. Witthoeft, 117 Mo.
App. 625, is referred to as authority for the relator's
position. That was an application for a writ of prohi-
bition and the writ was denied on the ground that it
was not a judicial tribunal to which the writ was to
be addressed. That is the only point decided in that
case. Two of the learned judges of the court ex-
pressed their individual opinions as to what the rights
of the parties would have been if the suit had been for
a writ of *mandamus,* and whilst those opinions on that
point are entitled to great respect, yet they are not
to be taken as an adjudication, because they were out-
side of the issue on which the case was decided. And
besides, they both rested for authority on the New
York case above cited, and since that case was deter-
mined by a bare majority, and since it was a case relat-
ing to a new subject, we ought not to feel that it settles
the question.

What is the relator's legal status? Is he an of-
ficer under the law? If so he is a State officer, for

his official acts have to do with the general elections, State and National. All State officers under the laws of this State must be either elected or appointed; if to be elected every qualified voter in the city has a right to vote for or against him. How then can the General Assembly say that no one can vote for or against the candidate except members of a certain political party? And if a vacancy should occur in the office after the election how is it to be filled? There is no provision in the statute for filling vacancies; therefore, section 11 of article 5 of the Constitution applies: "Whenever any office shall become vacant, the Governor, unless otherwise provided by law, shall appoint a person to fill such vacancy, who shall continue in office until," etc. Suppose a vacancy should occur in a Republican committee: is a Democratic Governor to make the appointment? Unquestionably that is the law of the case if this is an office.

During oral argument it was said that this was not exactly an office but a quasi-office. I do not know what legal attributes to ascribe to a quasi-office. When we come to a judicial determination of the rights of a party it is necessary to define his position. In a case of this kind he is either an officer or he is not an officer, and if he is not an officer he is not entitled to a judgment "as if" he were an officer. I have already said that the control of primary elections was not entirely beyond the power of the Legislature; it may under its police power make such laws as it deems wise to prevent fraudulent misconduct and crimes connected with such elections and punish offenders. In the concluding section, but one, of this act, the General Assembly has undertaken to exercise that power, has declared certain acts to be misdemeanors and prescribed the punishment for the offenders; of such the courts have jurisdiction.

There has been a tendency in recent years to bring

into the courts controversies concerning political party management; in my opinion the legislation in that direction has had an evil effect and no good has been accomplished. The management of political campaigns ought to be left alone with the political organizations, courts should have nothing to do with them. The parties choose their committees and a committeeman should be held to answer in the forum of public opinion of its own party for its conduct. Legislation undertaking to regulate party management or to give the courts controlling power over the conduct of political committees is contrary to the spirit of our government, it is a restriction on the rights of free citizenship, the right of citizens to form their own committees and associations and exert their influence in elections as to them seems best without dictation from the courts, subject of course to the authority of the State by its executive, legislative and judicial powers to prevent fraud and to secure every one in his rights as a citizen.

For these reasons I am of the opinion the relief asked in this suit and the suits of like purpose now on our docket should be denied.

Judge *Graves* concurs in this opinion.