# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## LEWIS AND ALS v. WHITTLE AND ALS.

### April 19th, 1883.

### Absent, *Lewis, P.**

1. MANDAMUS—*Offices—Rule.*—This writ is an extraordinary remedy in cases where the ordinary modes of proceeding are powerless, and without its aid there would be a failure· of justice. The rule of this court is that *mandamus* is the true specific remedy for a wrongful deprivation of an office. Under *quo warranto* information, judgment might remove the occupants, but could not install the claimants.

2. IDEM—*When allowed.*—Wherever there is a right to exercise an office, perform a service, or exercise a franchise, and one is dispossessed of such right and has no other adequate specific remedy, then *mandamus* should· be allowed, for sake of justice, and peace, and good government.

3. MEDICAL COLLEGE OF VIRGINIA—*Public Corporation—Governor—Legislature—Case at bar.*—In 1854, the Medical College of Virginia was incorporated, with a board of nineteen visitors, named in the charter, and required to make annual report to the second auditor. Power was reserved to the legislature to modify, alter or repeal the charter at pleasure. An appropriation of $30,000 was made to the college in 1860, in consideration that it convey all its property to the literary fund. The conveyance was made. In 1866, an appropriation of $1,500 was made, and a like sum has been annually appropriated since then. The charter empowers the governor to fill any vacancy which may *occur* in the board by reason of death, resignation or otherwise. In 1882 the governor *removed* the entire board of visitors and appointed a new board. The former refused to surrender, and on petition of the latter for a writ of *mandamus:*

HELD:

    1. This college is a public corporation.

    2. The visitorial authority is in the state.

---

* Judge Lewis is related to one of the petitioners.

3. The power of removing and appointing the visitors is reserved in the charter to the legislature, and has not been granted to the governor.

4. To him has been given only the power to fill vacancies which may *occur* by reason of death, resignation or otherwise, but not *to remove* and so *create a vacancy* in order to fill it.

5. There is no such thing in this state as a visitor holding, as in England, by life-tenure.

On petition for a writ of *mandamus* by John F. Lewis and eighteen others, who, on 22d September, 1882, were appointed by his excellency, William E. Cameron, governor of Virginia, as a board of visitors of the Medical College of Virginia, from this court, to command the respondents therein, to-wit, F. M. Whittle and eighteen others, who, before that day, constituted the board of visitors of that college, to deliver to the petitioners the possession thereof, which they have hitherto refused to do. The petition sets forth the appointment of the petitioners by the governor, and claims the right of the petitioners to have possession of the college by reason of said appointment.

The respondents answer that they are the rightful visitors of the college, holding their office under the charter of the college, and deny the authority of the governor to remove them from their office of visitors.

The remaining facts and the questions raised are stated in the opinion of the court.

*Attorney-General F. S. Blair*, for the petitioners.

*Joseph Christian, W. W. Henry, John W. Johnston*, and *Guy & Gilliam*, for the respondents.

LACY, J., delivered the opinion of the court.

The first question raised in this case is as to the nature of the proceedings. The respondents say that *mandamus* will not lie in this case; that they can be removed from office only by *quo*

*warranto*, and that they cannot be so removed by *mandamus*. This question has been so often and so recently settled in this court that it cannot be now regarded as an open question.

Without entering at length into a discussion of the nature and origin of the writ of *mandamus*, it is sufficient to say it is an extraordinary remedy in cases where the usual and ordinary modes of proceeding are powerless to afford remedies to the party aggrieved, and when without its aid there would be a failure of justice.

Wherever there is a right to execute an office, perform a service, or exercise a franchise, more especially if it be a matter of public concern, and a person is dispossessed of such right and has no other specific adequate remedy, then the court ought to assist by *mandamus* upon reasons of justice, as expressed by the writ, and upon reasons of public policy, to preserve the peace, good order and good government. It ought to be used on all occasions when the law has established no specific remedy. Whatever may be the rule elsewhere, it may be safely laid down as the doctrine of this court that *mandamus* is the true specific remedy for a wrongful deprivation of an office. What other specific adequate remedy has these petitioners, if they are clearly entitled to this office? If, as suggested, *quo warranto* should be adopted, and the petitioners should succeed there, they would not thereby be put in possession of what they seek, but might still be put to the necessity of *mandamus* for relief. They might succeed by *quo warranto* in removing their adversaries from the office, and yet need the *mandamus* to put them in possession. No proceeding that will give them less than they ask can be said to afford them a specific and adequate remedy, if they are entitled to what they seek. Under the *quo warranto* information, judgment might remove the occupants, but would not install the claimants. They might still find it necessary to ask other process against some other person or officer who might deem it his or their duty to keep them out.

We think that although there may be other adequate remedies, there is no other so complete as *mandamus.* See opinion of Staples, judge, in *Johnson* v. *Mann, Judge, &c.,* lately decided in this court, and not reported, and the opinion of Judge Richardson, in the same case, on a rehearing in this court, and authorities there cited. *Ante* page 265.

It is earnestly contended by respondents that this college is a private corporation and not under the control of the governor, or any other public authority, and this is the second question upon which we are to pass.

In 1854 the Medical College was incorporated, with a board of visitors—nineteen in number, and the said visitors were named in the charter.

By the seventh section it was provided, that "whenever any vacancy shall *occur* in the said board by reason of death, resignation or otherwise, *then* the governor shall fill the same, selecting the visitors so appointed from each of the grand divisions of the state."

The board of visitors were required to make an annual report to the second auditor, such as is required by the twelfth section of the eighty-third chapter of the Code.

In the charter, the legislature reserved the right at its pleasure to modify, alter, or repeal the charter, provided for an acceptance by the then existing faculty, and disclaimed any intention by the legislature to reflect on the trustees of Hampden-Sidney College, or the faculty of the medical school in Richmond.

Before the passage of this act there was a medical school in Richmond, which was under the patronage of Hampden-Sidney College. Dissensions between the faculty of the medical school and the trustees of Hampden-Sidney College led to the act of incorporation seen above. In 1860 the legislature appropriated $30,000 to this college upon the condition that the college authorities should execute and record a deed conveying all the property of the college to the literary fund of the state; this deed to be drawn by the attorney-general and approved by the

governor. This deed was executed, and by another act of February 26, 1866, the legislature of the state appropriated $1,500 to the said college, which has been annually appropriated by the legislature ever since. This brief history of this college shows that once in its history it was a private school; that upon its solicitation, and by the consent of its authorities it was incorporated, and the succession of its board of visitors placed under public control; that by subsequent solicitation and consent it parted with all its property to the state, and executed and delivered a deed to the state for the same, and received from the state $30,000. That subsequently it has solicited and received $1,500 annually from the state, and has undertaken to submit an annual report, on the part, both of its board of visitors and of its faculty, to a public officer of the state; so that it now appears, by its own consent, to have become a public corporation, holding its life and chartered existence, and the possession of all its property, at the pleasure of the legislature of the state.

Strictly speaking, public corporations are such only as are founded by the government for public purposes—where the whole interest belong also to the government.

The *Trustees of Dartmouth College* v. *Woodward,* 4 Wheaton, 669. See opinion of Story, judge.

This medical college is in every sense a public corporation, made so in the manner already stated. The visitors of this college are then holding under an act of the legislature a public office or employment, subject to the control and direction of the state—to be appointed and to be removed by competent public authority. The visitorial power of this college is therefore in the state of Virginia, and to be exercised under the laws of the state. What is the competent public authority vested by law with the power to remove the visitors of the said college? This is the last and only question in this controversy about which there can be any real dispute.

To this question, in fact, has been mainly directed the efforts

of the counsel who have argued this case here. Many authorities have been cited, and illustrations drawn from the common law and its ancient offices. But the tenure of ancient common law offices, and the rules and principles by which they are governed, have no application to such offices as these. The tenure in those cases depends upon ancient usage in a great measure. But here we have no ancient usage which can apply to and govern the tenure of offices created by our constitution and laws. They are of recent origin, and must depend entirely on a just construction of the law by which they are created. In such case, the tenure of the office must be determined by the meaning and intention of the statute by which they are created.

What are the terms of the charter of this college concerning the visitors appointed thereunder?

The legislature not only incorporates the college, but appoints the board of visitors; it *reserves* the right to *modify, alter* or *amend* the charter at its pleasure. It grants to the governor of this state certain powers, and so far as these powers are granted and no further, can they be exercised by the governor. Under our system of government, the governor has and can rightly exercise no power except such as may be bestowed upon him by the constitution and the laws. The charter of this college confers on him the power to fill by executive appointment such vacancies as may *occur* in the office of visitor of this college by *death,* resignation or otherwise. The power to fill vacancies as they have occurred for the last twenty-nine years, comprising the existence of the college has been exercised by many successive governors of this state, and has never been questioned or denied.

But, as is disclosed by the proceedings here, on the 22d day of September, 1882, the governor *removed* the entire board of visitors of the college. The said board of visitors deny the power or authority of the governor to so remove them, and refuse to give possession of the college to petitioners here, who have been designated by the governor as their successors, and this court

is now asked by *mandamus* to compel the said respondents to surrender possession of the said college. This is a delicate responsibility imposed upon this court, but this court can regard the question only in the light of a controversy between two conflicting claimants. The court cannot refuse its writ if petitioners are entitled to have it issued, nor, on the other hand, can it award the writ if respondents are entitled to hold the said college. And in determining this question the court can be guided by nothing but the law of the land as it is written. Petitioners claim that the governor is the appointing power, and that without any express authority in the law the power to remove is incident to the power to appoint. Into this wide and much contested field it cannot be necessary to go until we settle the question whether the governor is the appointing power. By the charter of the college, as we have seen, the legislature appointed the visitors, and reserved to itself only the power to *alter* or *modify* or *amend* the said charter. The appointing power in *general* terms is not conferred on the governor in the charter, but a limited power of appointment—to-wit, the power to fill vacancies—and when we look to see what vacancies we find that the power is granted to fill vacancies that may occur (that is, may happen—an occurrence is an accidental event) by death, resignation, or otherwise. A death may occur, a resignation may occur, and the attorney-general insists earnestly in the argument in this case that the word otherwise, coupled with the word occur—that is, "*occur otherwise*"—is broad enough to cover a wholesale removal of the nineteen members of the board by a single order to that end. If the legislature had so desired or intended, it was as easy to use the word removal as any actually used, and we think it is safer to consider that such words as are used are those intended to be used, and such words as are not used were not intended to be used.

If we consider this charter in the light of the circumstances which surrounded its enactment, we are strengthened in our views. When it was enacted, the state was not the owner, as

now, of all its property, and was not, as now, maintaining the college, in part, by annual appropriations. The power to repeal was reserved, and it may be inferred that as long as the college was used for the purposes for which it was incorporated, that there could be no desire to repeal the charter, or to remove the visitors, and no such desire existing, it would be a strained construction to discern an authority to remove, ingeniously disguised in an authority to fill occurring vacancies. If we remember that the state had at the time the charter was granted no greater interest in the college than such as might desire its greatest usefulness and prosperity, independent of any right of property therein, it is not difficult to discover why removals were not provided for, and indeed why no term was limited in the office of visitor. And when we remember that in twenty-eight years, this act has received only this construction at the hands of successive governors, who, during many successive terms of office, and many years, have filled only such vacancies as have occurred under the terms and within the exact·limit of the language itself, we are sustained by the contemporaneous construction which this charter has thus received. If the present governor of the state is authorized to make these removals, then each governor who has filled the gubernatorial office since 1854, has had the same authority, and yet it has never been exercised. If the governor of the state had, under this charter, enacted in 1854, removed all the visitors of this college in 1855, it would have doubtless been received with surprise, but it cannot be denied that *he* would have had all the authority which exists now to that end.

This much for the executive cotemporaneous construction of this charter. What has been the legislative construction of the same? The attorney-general, in the argument of this case here, exhibited two bills introduced into the legislature of the state at its last session, having for their object the removal of the board of visitors of this college. If the legislative construction of this charter was that the governor already had the

power to remove all the visitors and appoint others, where was the necessity of passing a law to that effect? And upon an inspection of the journal of the two houses, we find that *three* bills were introduced in the last legislature to that end, which were not enacted into laws, and this, taken in connection with the fact that every board of visitors of every other college or asylum in the state was removed, and when we remember that every visitor of every board had been appointed by the governor, we see plainly enough the legislative construction of the power to remove these officers.

We have searched in vain the many cases referred to by the attorney-general to find one like the case at bar. In *Hennen's Case,* 13 Peter's, 225, much relied on, the supreme court of the United States maintain the power of the courts to remove their clerks, because their original appointment is placed there by the act of congress, and no power concerning them *reserved* by congress, and a life tenure was held to be at variance with all our institutions. In *Newsom* v. *Cocke,* 44 Miss. 352, the question turned upon the act of the legislature, which, in *express terms,* gave to the governor the power in all cases to remove from office, in every case where he had the power to appoint. And so in the case of *Williams* v. *Boughner,* 6 Caldwell, 487. The act of the legislature gave the governor the power to remove the commissioner for cause, and the whole question was, whether the governor could remove without cause. The case of the *United States* v. *Avery,* Deady's R., proceeded upon the precise ground already stated as to *Hennen's Case,* 13 Peter's, 225. It is not deemed necessary to review in detail the many authorities cited; it may suffice to say that none are like this case. In *Bouldin's Case,* 6 Leigh, 639, the removal was conceded to the judge, as to one of the officers of his court appointed by himself; and in *McDougal's Case,* 27 Gratt. 133, the right of the judge was maintained to remove for cause an officer appointed by himself.

In the case of *The Commonwealth, &c.* v. *Bussiel,* 5 Serg't & Rawle, 451, cited as parallel by the attorney-general, we find

upon an examination of the case that the officer was appointed by the governor, and not by the legislature, and that he had received three separate commissions from as many different governors, and that by the very terms and express language of his commission he was entitled to hold until that commission should be by the *governor*, or other competent authority superseded and annulled. And the first question this appointee raised was: " 1. Is this such an office as the governor has the *right to appoint to ?* " and " 2. If so, does the officer hold during the governor's pleasure." It would be ingenuity indeed which could discover any likeness in that case to the one we are now considering. That case turned upon the constitution and laws of that state, and this case is governed by the laws of this state.

But no case has been cited, and no case, we believe, can be cited, where an officer appointed by the legislature is held to be removable by the governor without *express authority to that end*, and where the power to fill a casual and occurring vacancy, a power to appoint expressly limited, has been ever held to carry with it, either a general power of appointment or the authority *to remove*, and so create *a vacancy* in order to fill it.

To conclude, we are of opinion that the power of visitation as to this college, is in the state, and by the charter expressly reserved in the legislature, and' not granted to the governor. We hazard nothing in saying that there is no such thing in this state as a visitor holding, as in England, by life tenure. These visitors in this case hold simply at the will of the legislature, subject to be removed whenever the legislature shall so provide— the legislature has not so provided; and so the writ in this case must be denied.

MANDAMUS DENIED.