Pyramid Products, Inc., Plaintiff and Appellee, *v.* Rafael Buscaglia, Treasurer of Puerto Rico, Defendant and Appellant.

No. 8952. Argued December 1, 1944.—Decided April 19, 1945.

*Jesús A. González*, Acting Attorney General, *Fernando B. Fornaris*, Assistant Attorney General, *Arcilio Alvarado*, Legal Adviser of the Treasurer of Puerto Rico, for appellant. *Hartzell, Kelly & Hartzell*, and *Rafael O. Fernández* for appellee. *James R. Beverley, K. Castro Fernández*, and *José López Baralt*, as amici curiae.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

The appellee brought this action to recover the amount of $94,188.22 which the Treasurer, pursuant to Act No. 217 of May 12, 1942 (Laws of 1942, p. 1150), collected as taxes, surcharges, and interest, and the appellee paid under protest for gasoline which it had imported during the years 1930, 1931, 1932, and 1933 and shipped to its warehouses in Santo Domingo in order to be sold there.

Act No. 12 of April 21, 1930 (Laws of 1930, p. 158), in force in this island from July 1, 1930, to July 23, 1931, levied a tax of six cents, once only, on each gallon of gasoline "sold or consumed in Puerto Rico." This Act was repealed by Act No. 40 of April 24, 1931 (Laws of 1931, p. 360), effective July 24, 1931, which levied, once only, a tax of seven cents on each gallon of gasoline "imported, manufactured, sold, used or consumed, or otherwise disposed of *for consumption in Puerto Rico.*" (Italics ours.) The Act further provided that this tax had the character of an internal revenue tax and therefore, was uniform and general, both on the article produced in foreign countries and brought to Puerto Rico as well as on the article manufactured in this island, and that such tax should be "subject to the provisions of the Internal Revenue Law, as soon as the gasoline is manufactured, produced or introduced into Puerto Rico."

Before said Act of 1931 became effective, the then manager of the appellee inquired from the Treasurer of Puerto

Rico what was the policy, that was going to be followed by the Treasury Department as to the gasoline introduced after the enactment of Act No. 40 and subsequently exported. On July 23, 1931, the Treasurer answered by letter explaining the practice that the Department was to follow in connection with the collection of the tax. In consonance with said letter and resting on the authority conferred on him by § 39 of the Internal Revenue Law of Puerto Rico, Act No. 85 of August 20, 1925 (Laws of 1925, p. 584), as amended by Act No. 83 of May 6, 1931 (Laws of 1931, p. 504), the Treasurer on July 24, 1931, promulgated the Internal Revenue Regulations effective on August 4, 1931, § 30 of which reads thus:

"Articles which are imported or manufactured to be exported and were exported within a reasonable period shall be exempt from the payment of the taxes if they are declared within the period of ten days, provided it is previously established that they have been manufactured or imported for exportation and that in effect they have been exported. All those articles in possession of their manufacturer or importer at the time shipment is made or order of contract of exportation or any document 'in connection with said exportation is issued, which establish that said manufacturer or importer shall export and ship said article before the same is sold or should be sold in Puerto Rico to be used or shipped to another person, shall be considered as imported or manufactured for exportation. Proof to that effect should be presented when the Treasurer so requires it."

When Act No 40 of 1931 became effective, the appellee had in stock 51,300 gallons of gasoline imported under the former Law, and after the effective date of the Act of 1931 the appellee introduced into Puerto Rico during said year and 1932 and 1933 diverse amounts of gasoline on which, as well as on the 51,300 gallons which it had in stock when the Act of 1931 was enforced, it paid the tax of seven cents per gallon. Out of all this gasoline, it exported, during said years, to its warehouses in Santo Domingo the amount of 547,236

gallons. The gasoline was not sold in Puerto Rico, the transaction consisting in a simple transfer of gasoline from the tanks which the appellee had in Puerto Rico to those it had in Santo Domingo. It was received there on consignment and sold by appellee's agents on its account, and upon fixing the selling price in Santo Domingo the tax which had been previously paid when the gasoline was introduced into Puerto Rico was not reckoned inasmuch as said tax was reimbursed under § 30 of the Treasurer's Regulations as soon as the appellee established the fact of exportation and other details required by the Regulations. The refund of the tax was effected by means of vouchers signed and approved by the Treasurer, the Auditor, and the Governor of Puerto Rico. This administrative practice was applied to all persons and entities who imported gasoline to be exported later without performing any transaction in Puerto Rico and was not abandoned—as admitted by the present Treasurer in his brief—until February 1942, shortly before the approval of Act No. 217 of 1942. Section 2 of this Act amended § 1 of Act No. 40 of 1931, thus:

"By this Act there is hereby levied, and there shall be collected and paid, once only, as an internal-revenue tax, the sum of seven (7) cents on each gallon of gasoline imported into, or manufactured, sold, transferred, used, consumed, or produced in Puerto Rico; . . ."

And § 4 thereof added to said Act of 1931, among other Sections, the following:

"Section 4-a. If any person bound under this Act to pay an excise tax on articles manufactured, produced, sold, transferred, used, or consumed, in or brought into, Puerto Rico, fails to do so at the time and in the manner established by this Act, besides being guilty of a misdemeanor, he shall pay, in addition to said tax, and as a part thereof, as a penalty, five (5) per cent of the amount owed, plus interest thereon at the rate of one (1) per cent a month, to be computed from the date on which, according to the provisions of this Act, the payment should have been made."

Act No. 217 of 1942 further provided as follows:

"Section 5. The tax levied, as well as the tax levied and already collected on each gallon of gasoline or of any mixture, solution, or combination containing gasoline or in which gasoline is used, brought into, or manufactured, sold, transferred, used, consumed, or produced in, Puerto Rico; . . . from July 1, 1931, up to the date this Act takes effect, levied or levied and already collected by virtue of Act No. 40, approved April 24, 1931, as amended by Act No. 15, of August 24, 1933, and by Act No. 68, of May 13, 1934, are hereby levied anew, legalized, validated, and ratified; and the levying and the levying and collecting of said taxes by virtue of the provisions of the aforesaid Acts, as well as, and including, the levying and the levying and collecting of the tax levied by virtue of this Act on each gallon of gasoline or of any mixture. solution, or combination containing gasoline or in which gasoline is used, brought into, or manufactured, sold, transferred, used, consumed, or produced in, Puerto Rico; . . . from July 1, 1931, up to the date of this Act, are hereby levied anew, legalized, validated, and ratified, for the same purpose and with like force, efficacy, and effect as if this Act had been in force since July 1, 1931, to which date all the purposes and provisions of this Act are made retroactive without any limitation.

"And the Treasurer of Puerto Rico is directed immediately to collect said taxes with surcharges and interest if the payment thereof has not been already made, or if, having been made, the sums collected had for some reason been returned to the debtor or taxpayer; . . . *Provided,* That the Treasurer shall fulfil this obligation to collect, and the taxpayer shall be bound to pay, said taxes even in those cases where they may have been paid by the taxpayer and reimbursed by the Treasurer within the period comprised between July 1, 1931, and the date this Act takes effect.

"Section 6. Section 4 of Act No. 170, of May 13, 1941,[1] is hereby repealed; it being expressly declared that it was not the

---

[1] Section 4 of Act No. 170 of May 13, 1941, (pp. 1024, 1028) provides:

"The effectiveness of this Act is for all purposes made retroactive to July 1, 1931, the same as if said Act No. 40, approved April 24, 1931, had been approved on this latter date in the manner in which it is amended by this Act; *Provided,* That from and after the date on which this Act takes effect there shall be collected the taxes of seven (7) cents and four (4) cents on each gallon of gasoline, gas oil, or Diesel oil, respectively, manufactured, sold, used, or consumed in Puerto Rico, or introduced into this island for sale, use, or

intention and the purpose of the Legislature of Puerto Rico, in passing Act No. 170, of May 13, 1941, to exempt from the levying or from the levying and collection of the tax on each gallon of gasoline or of any mixture, solution, or combination containing gasoline or in which gasoline is used, or of the tax on each gallon of gas oil or Diesel oil as said tax was originally levied by said Act No. 40, of April 24, 1931, as amended by Act No. 15, of August 24, 1933, and by Act No. 68, of May 13, 1934, the gasoline or any mixture, solution, or combination containing gasoline or in which gasoline is used and the gas oil or Diesel oil brought into, or manufactured, sold, transferred, used, consumed, or produced in, Puerto Rico from July 1, 1931, up to the date this Act takes effect.

"*      *      *      *      *      *      *

"Section 8. All penal provisions contained in sections 4-a, 4-b, and 4-c,[2] added by virtue of this Act, shall have only prospective effect, and in no case shall said penal provisions be applied retroactively for acts or omissions committed on a date prior to the taking effect of this Act."

Relying on this Act the Treasurer required the appellee to pay the seven-cent tax on each gallon of gasoline which it had shipped to Santo Domingo, the total amount collected being $94,048.39,[3] make up of the following items:

| | |
|---|---:|
| Tax of seven cents per gallon | $41,943.30 |
| Surcharges | 2,097.17 |
| Interest | 50,007.92 |
| Total | $94,048.39 |

The Treasurer's contention is that under the Act of 1931,

consumption, on which the corresponding tax has not been collected; *Provided, further,* That no tax whatsoever shall be returned which has been collected prior to July 1, 1931, for any of the reasons above described, and the refund of which is requested on the ground that Act No. 40 of April 24, 1931 does not levy any tax on the manufacture, sale, use, or consumption in Puerto Rico. or introduction into Puerto Rico, for sale, use, or consumption of gasoline, gas oil or Diesel oil."

[2] Section 4-b and 4-c are not copied because they have no bearing on the case.

[3] The amount claimed by the appellee amounts to $94,188.22 because when the payment was made under protest additional interest had accrued for the sum of $139.83.

the internal revenue tax must be levied on all the gasoline once it has been introduced into Puerto Rico; that the return of the taxes which appellee paid for the aforesaid items during the year 1931, 1932, and 1933, was not authorized by law and that Domenech, the Treasurer, lacked the authority to approve the Regulation promulgated on the same day on which the Act of 1931 became effective, because his authority to promulgate regulations was confined to the Internal Revenue Law and was not extensive to the Act approved in 1931 creating the gasoline tax. Finally the Treasurer urges that the Act of 1942 amended the Act of 1931 retroactively, so that it operated as if the Act of 1931 had always been as amended in 1942; that it did not levy a new tax with retroactive effect, but that it re-levied the tax which had been imposed by the Act of 1931, which was not paid by the appellee on the gasoline in question inasmuch as it had been refunded by the Treasurer.

The decision rendered by the Supreme Court of the United States on November 20, 1940, in *West India Oil Co.* v. *Domenech*, 311 U. S. 20 (1940), dispelled the doubt as to the power of the Legislature of Puerto Rico under § 5 of the Organic Act—as amended by the Butler Act of 1927 —to levy taxes on articles imported from the United States or from foreign countries as soon as they were introduced into Puerto Rico. In said case Act No. 40 of 1931 now before us was not in question. There was challenged the power of the Treasurer to demand and collect the 2 per cent tax (Internal Revenue Law, § 62 as amended by Act No. 17 of June 3, 1927, p. 457) on the fuel oil which the plaintiff therein had imported in Puerto Rico and deposited in bonded tanks under the control of the Custom Service, from which the oil was released under the supervision of the Federal agents, to be delivered, in compliance with sale contracts, to vessels for use as fuel upon their voyages to foreign countries. It was held by the Supreme Court of the United

States that, under the Butler Act, Congress authorized the Legislative Assembly of Puerto Rico to levy taxes on articles imported from the United States or from foreign countries as soon as they were introduced into Puerto Rico, provided that no discrimination was made between imported articles and those produced in the Island, that this power extended not only to merchandise in its original package but to that which was not as well, and further that the 2 percent sales tax under the aforesaid conditions was valid.

But the fact that our Legislative Assembly is authorized to levy an internal revenue tax as soon as the article is introduced into Puerto Rico from the United States or from foreign countries does not mean that when it approved Act No. 40 of 1931 it exercised said power by levying the 7 per cent tax on each gallon of gasoline as soon as it was introduced, regardless of whether it was for consumption in Puerto Rico.

The policy of the Legislative Assembly as evinced in legislation, whether contemporary with, or prior or subsequent to, Act No. 40 of 1931, was not to tax articles imported from the United States or foreign countries unless said articles were imported for sale or consumption in Puerto Rico. This policy was abandoned, as admitted by the appellant, on February 1942, after the decision of the Supreme Court of the United States in *West India Oil Co.* v. *Domenech, supra,* became known and when Act No. 217 of 1942—which amended Act No. 40 of 1931—was in its formative stage whereby a tax was levied on the gasoline imported from foreign countries or the United States independently of whether said gasoline was to be consumed in Puerto Rico. It may be seen therefore that by Act No. 12 of 1930, despite the fact that the Butler Act had been approved three years before, the Legislature upon amending § 2 of Act No. 8 of May 11, 1927 (Laws of 1927, p. 420), provided: "That there shall be levied, collected and paid as an internal-rev-

enue tax, once only, the sum of six (6) cents for each gallon of gasoline *sold or consumed in Puerto Rico; . . .*" (Italics ours.)

And § 38 of the Internal Revenue Law, as amended by Act No. 83 of May 6, 1931 (Laws of 1931, pp. 504, 520)— that is, approved twelve days after Act No. 40 of 1931— upon taxing certain articles provided:

"The user or consumer of a taxable article shall be liable for the payment of the tax upon introducing or coming into possession of the article *for use or consumption in Puerto Rico,* or upon transferring the same to another person for whatever purpose." (Italics ours.)

Subsequently Act No. 267 of May 15, 1938 (Laws of 1938, 497), construed in *Mayagüez Sugar Co.* v. *Carreras, Treas.,* 59 P.R.R. 716 (1942), provided in its first Section as follows:

"By this Act there shall be levied, collected, and paid as an internal-revenue tax, once only, the sum of one-fourth ($\frac{1}{4}$) of a cent on each gallon of molasses brought into, or manufactured, sold, consumed, or otherwise disposed of for consumption in, Puerto Rico; . . ." (Italics ours.)[4]

Finally Act No. 171 of May 13 of 1941 (Laws of 1941, p. 1032), upon amending § 1 of Act No. 267 of 1938, used the following language:

---

[4] It should be noted that in *Mayagüez Sugar Co.* v. *Carreras, Treas., supra,* the question before the court was whether molasses manufactured in Puerto Rico was subject to taxation only when it was manufactured for consumption in Puerto Rico. It was held that the words "for consumption in Puerto Rico" was not applicable to the antecedent "manufactured" because this was prevented by the antecedent "consumed" which could not qualify the words "for the consumption in Puerto Rico" because a redundance would result therefrom, taking note specially of the preamble of the Act and the circumstance that since the sugar-cane molasses is a product manufactured for exportation the tax which was attempted to be levied would be defeated if it were construed that the manufacture thereof was only taxable when the product was manufactured for consumption in Puerto Rico. The question of the importation of articles from the United States or from foreign countries was not in question in said case. It is worth noting, however, that Act No. 267 of 1938 raises no doubt whatsoever that in order to tax the importation of molasses it was an indispensable requisite that their importation be for consumption in Puerto Rico.

"There shall be levied, collected, and paid, as an internal-revenue tax, the sum of one-fourth (¼) of a cent on each gallon of cane molasses in any manner produced, used, sold, or consumed in Puerto Rico, *or introduced into Puerto Rico for sale, use, or consumption.* . . ." (Italics ours.)

It has, therefore, been established that the policy of the Legislature was not to tax those articles introduced into Puerto Rico unless they were to be consumed in the Island.

Act No. 40 of 1931 levies a tax of seven cents "on each gallon of gasoline imported, manufactured, sold, or consumed, or otherwise disposed of *for consumption in Puerto Rico.*" (Italics ours.) The words "or otherwise disposed of" after the verbs "imported, manufactured, sold, or consumed" indicate another manner of disposing of the article, as for example, conveying, using or giving. And if the gasoline which is otherwise disposed of by conveyance, use or gift, is only taxable when it is disposed of by any of these means, for the consumption in Puerto Rico, there is no reason to believe that it was not the intention of the Legislature to require that the sale,—which is one of the manners of disposing of the gasoline,—in order to be taxable should be for consumption in Puerto Rico. And if the sale, use, consumption, conveyance, or gift of the gasoline are only taxable when it is for consumption in Puerto Rico, we must conclude that it was not the intention of the Legislative Assembly to tax the importation of the gasoline when it was made for purposes other than to dispose of it by any of the aforesaid means "for the consumption in Puerto Rico."

That the legislative intention was that the words "for the consumption in Puerto Rico" should modify the different means of disposing of the article is disclosed by the Legislative Assembly itself, which upon resolving to tax the mere importation of the gasoline [4a] it amended, by Act No.

[4a] Whether or not the Legislature has authority to levy a tax on the mere introduction of gasoline into Puerto Rico, is a matter which we expressly leave without deciding because it is unnecessary for the purposes of this case.

217 of 1942, the first Section of Act No. 40 of 1931 by completely eliminating the phrase "or otherwise disposed of for consumption in Puerto Rico," and enacting it thus:

"By this Act there is hereby levied, and there shall be collected and paid, once only, as an internal-revenue tax, the sum of seven (7) cents on each gallon of gasoline imported into, or manufactured, sold, transferred, used, consumed, or produced in, Puerto Rico; ..."

The Treasurer, who by reason of his office was especially informed of the administrative needs and conveniences, *Estate of Sanford* v. *Commissioner*, 308 U. S. 39 (1939), when enforcing the Act of 1931 construed the same, as we have seen, in the sense that the introduction of gasoline was taxable only when the article was introduced for the consumption, sale, or conveyance, or when it was otherwise disposed of, for consumption in Puerto Rico. And during the eleven years covering the period between 1931 when the policy was put in practice and 1942, when it was abandoned, the various auditors and governors of Puerto Rico accepted this construction as correct, since they signed, together with the Treasurer, the orders of payment for the refund of the tax collected when the gasoline was imported to be subsequently exported.

And these officers were not the only ones who thus construed the Act. Mr. Enrique Campos del Toro, Acting Attorney General, in his opinion dated November 6 of 1939,[5] addressed to the Treasurer of Puerto Rico, placed the same construction on that part of § 1 of Act No. 40 of 1931 referring to gas oil and Diesel oil—aided by Act No. 68 of 1934—which reads thus:

"... There is hereby levied and shall be collected and paid, once only, a tax of four (4) cents a gallon on gas oil and Diesel oil *imported into, or manufactured, used, or consumed, or otherwise disposed of for consumption in, Puerto Rico,* which tax shall be levied

---

[5] Although this opinion is not published in the Attorney General of Puerto Rico's Reports, we have at hand a certified copy thereof.

and collected in the same manner as that previously established for gasoline and its combined products." (Italics ours.)[6]

The opinion of Acting Attorney General Campos del Toro reads in its pertinent part as follows:

"The advice which you seek involves the construction of the above-copied statutory provision. . . .

" * * * * * * * *

"The letter of the statute is clear and free from ambiguity. It appears therefrom that a four-cent tax shall be levied on each gallon of gas oil and diesel oil imported, manufactured, used, consumed or otherwise disposed of *for consumption in Puerto Rico.* The words 'to import,' 'to manufacture,' 'to use,' 'to consume,' or 'to dispose,' are followed by the phrase 'for consumption in Puerto Rico.' Therefore, the phrase 'for consumption in Puerto Rico,' inserted by the lawmaker at the end of the sentence and after the words 'to import,' 'to manufacture,' 'to use,' 'to consume,' or 'to dispose,' completes and qualifies the meaning or significance of the five verbs which precede the use of said phrase.

" * * * * * * * *

"It is our opinion, therefore, that the tax is levied not only on the mere introduction, but on the introduction for consumption in Puerto Rico, it appearing from the letter of the law that in order that it be taxable the concurrence of both elements is necessary, to wit, the introduction of the article plus that it be for consumption in Puerto Rico.

" * * * * * * * *

"*West India Oil Co.* v. *Rafael Sancho Bonet*, decided on May 10 of the current year [54 P. R. R. 695], is distinguishable from the present case. The former involved the 2 per cent sales tax and our Supreme Court held therein that although the contract of sale was perfected in New York, said contract was consummated in Puerto Rico, the place of delivery of the merchandise and, therefore, it should be understood for the purposes of levying the 2 per cent sales tax, that the sale was made in the place of delivery; but in the American Mineral Spirit Co. case [object of consulta-

---

[6] As may be seen, the above-copied provision levies a tax on each gallon of gas oil or Diesel oil "imported into, or manufactured, used, or consumed, or otherwise disposed of for consumption in Puerto Rico," and uses a language substantially the same as the provision of § 1 of Act No. 40 of 1931 relating to gasoline.

tion] a sale tax is not involved, but an excise levied under Section 1 of Act No. 40 of 1931, as amended, the said excise to be paid by the taxpayer who imports gas oil or diesel oil for consumption in Puerto Rico. As it will be readily seen, the two cases may be easily distinguished."

It is a matter of common knowledge that ordinarily the revenue laws originate in the Treasury Department, and those that do not come from that source, are sent to the Treasurer before their approval in order that they be studied and reported on; so that there is no reason to believe that Treasurer Domenech who held office from a time prior to the approval of Act No. 40 of 1931 until after its enactment, was not aware of the legislative intent.[7] It is likewise significant that his successors in office as well as the various governors and auditors should have been aware of the legislative intent in passing an Act of such fiscal importance as the one under consideration.

In *De Castro* v. *Board of Commissioners*, 59 P. R. R. 673 (1942), this court cited, among others, the following paragraph of *Smith* v. *Bryan*, 40 S. E. 652, 654 (Va., 1902):

"It is a rule of construction that, if a statute is of doubtful import, a court will consider the construction put upon the act when it first came into operation, and that construction, after lapse of time, without change either by the legislature or judicial decision, will be regarded as the correct construction. Suth. St. Const., par. 307; *Anable* v. *Com.*, 24 Grat. 563–566; *Lewis* v. *Whittle*, 77 Va. 415, 422; *Mangus* v. *McClelland*, 93 Va. 786, 789, 22 S. E. 364.

"So, also, the practical construction given to a statute by public officials and acted upon by the people, is not only to be considered, but in cases of doubt will be regarded as decisive. It is allowed the same effect as a course of judicial decision. The legislature is presumed to be cognizant of such construction, and, when long con-

[7] It is worthy of notice that the construction given by the Treasurer to Act No. 40 was not an afterthought, but that the same had been already studied before its effective date, inasmuch as the Regulation was approved by the Treasurer on the effective date of the Act. *Norwegian Nitrogen Co.* v. *U. S.*, 288 U. S. 294, 315 (1933).

tinued, in the absence of legislation evincing a dissent, the courts will adopt that construction.''

The Supreme Court of the United States in *De Castro* v. *Board of Commissioners,* 322 U. S. 451 (1944), cited with approval the case of *Smith* v. *Bryan, supra,* and upheld the holding of the Supreme Court of Puerto Rico to the effect that the construction applied to a statute by the public and the persons affected thereby have an influence over the judicial interpretation thereof.[8]

The case of *United States* v. *Alabama Railroad Co.,* 142 U. S. 615 (1892), involved the construction of § 13 of the Act of Congress of July 12, 1876, which provided ''That railroad companies whose railroad was constructed *in whole or in part* by a land grant made by Congress on the condition that the mails should be transported over their road at such price as Congress should by law direct, shall receive only eighty per centum of the compensation authorized by this Act.'' (Italics ours.) The Postmaster General and the accounting officers of the Treasury of the United States, upon the approval of the Act, construed it in the sense that the reduced rate referred to in the statute in those cases where the railroad passed over part of the lands granted by Congress, should only be applied proportioned to the part of the line which had been constructed over the lands granted and that as to the remainder of the line full compensation should be paid. This construction which was not only given by the Postmaster General and the aforesaid officers, but

---

[8] The statute construed therein was Act No. 99 of May 15 of 1931 (p. 626), ''To Establish a Special Government for the Capital of Puerto Rico and for other purposes,'' § 21 of which reads thus:

''The City Manager shall be the chief executive of the Capital; he shall be appointed by the Board of Commissioners created by this Act and shall hold office *during good conduct.''* (Italics ours.)

It was held by this court, applying the practical construction given by the electorate, the political parties, and De Castro himself, that the tenure of office was 4 years, no longer than that of the Board of Commissioners which appointed him instead of ''during good behavior'' as appellant maintained.

also by the appellee, Alabama and Chattanooga Railroad Company, and its successor, was continued from 1876 to 1885 by six postmasters general, when in 1885, the Treasurer, reversed the rule of his predecessors, and not only applied the reduced rates to the entire line but made such construction retroactive, and required repayment of what the company under the prior construction of the statute had received for nine years. Upon deciding this question the Court said:

"We think the contemporaneous construction thus given by the executive department of the government, and continued for nine years through six different administrations of that department—a construction which, though inconsistent with the literalism of the act, certainly consorts with the equities of the case—should be considered as decisive in this suit. It is a settled doctrine of this court that, in case of ambiguity, the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced It is especially objectionable that a construction of a statute favorable to the individual citizen should be changed in such manner as to become retroactive, and to require from him the repayment of moneys to which he had supposed himself entitled, and upon the expectation of which he had made his contracts with the government. These principles were announced as early as 1827 . . . [Citing authorities.]"

And lastly, in *Estate of Sanford* v. *Commissioner,* 'supra, at p. 52, the same doctrine is set forth in the following terms:

"Administrative practice may be of persuasive weight in determining the construction of a statute of doubtful meaning where the practice does not conflict with other provisions of the statute and is not so inconsistent with applicable decisions of the courts as to produce inconsistency and confusion in the administration of the law. Such a choice, in practice, of one of two possible constructions of a statute by those who are expert in the field and specially informed as to administrative needs and convenience, tends to the

wise interpretation and just administration of the laws. This is the more so when reliance has been placed on the practice by those affected by it.''

To the same effect see also the Annotations: "Effect of Practical or Administrative Construction of a Statute on Subsequent Judicial Construction," 73 L. ed. 322; "Administrative or Practical Construction of Statute as Precedent for Judicial Construction," 84 L. ed. 28.

The Legislature itself, which is presumed to have knowledge of the construction given to the Act by the Treasurer and the other officers mentioned above (*Smith* v. *Bryan, supra;* 2 Sutherland, Statutory Construction, 3d ed., § 5109, p. 523, and cases cited), ratified the same from the moment it amended the Act in 1933 and did not substantially change its language in such a way as to call for a construction different from the one given by the administration (see Act No. 15 of August 24 of 1933, First Special Session, p. 80). It went still further the next year when, by Act No. 68 of May 13 of 1934 (Laws of 1934, p. 470), which amended again § 1 of Act No. 40 of 1931, it separated with a comma the phrase "of otherwise disposed of" from what followed "for consumption in Puerto Rico," thereby indicating more precisely its intention that the words "for consumption in Puerto Rico" should be applied to the different modes of disposing of the article.[9] We may add that the amendments by Acts No. 15 of 1933 and No. 68 of 1934 are of far reaching consequences. In a line of cases the Supreme Court of the United States has held that when an act has received an administrative construction, upon the same being subsequently reenacted without a substantial change in its language, it should be understood that the administrative con-

---

[9] Said Section, as amended by the Act of 1934, in its pertinent part reads as follows:

"By this Act there shall be levied, collected and paid, as an internal-revenue tax once only, a sum of seven (7) cents for each gallon of gasoline imported manufactured, sold, or consumed, or otherwise disposed of for consumption, in Puerto Rico; . . ."

struction has been adopted by Legislature and that it has thereby acquired the force of law. *Helvering* v. *Reynolds Co.*, 306 U. S. 110, 115 (1939); *Helvering* v. *Winmill*, 305 U. S. 79, 83 (1938); *Hartley* v. *Commissioner*, 295 U. S. 216, 220 (1935); *U. S. v. Dakota-Montana Oil Co.*, 288 U. S. 459, 466 (1933); *United States* v. *Cerecedo Bros. and Company*, 209 U. S. 337, 339 (1908); 2 Sutherland, Statutory Construction, *supra*. To the same effect, *Helvering* v. *Griffiths*, 318 U. S. 371, 395 (1943); *Comm'n* v. *Broadcasting System*, 311 U. S. 132, 137 (1940).

■ Challenging the administrative practice the appellant asserts, that the former treasurers had no authority to refund the tax collected by them or to issue the Regulations which had been issued by Treasurer Domenech on July 24 of 1931, and which provided the proceeding for the refund of taxes collected on gasoline that later was exported. The power to promulgate the Regulations in question, although not expressly provided by Act No. 40 of 1931, flowed from the above-mentioned Act No. 83 of 1931 which authorized him to promulgate regulations in connection with the Internal Revenue Law. Since § 1 of Act No. 40 of 1931 expressly provides that the tax levied by that Act shall have the character of an internal revenue tax, and "shall be collected by the Treasurer of Puerto Rico, subject to the provisions of the Internal Revenue Act," we are bound to conclude that the power to promulgate regulations was applicable to Act No. 40 of 1931.

■ The power to refund said tax flows from the Act approved on February 12, 1904 (Laws of 1904, p. 182), §§ 2365, 2366, and 2367 of the Revised Statutes of Puerto Rico, Compilation of 1911, p. 454. Section 2365 reads thus:

"Whenever it is found; either upon the application of any taxpayer satisfactory to the Treasurer of Porto Rico, or by the auditor or treasurer upon the revision and correction of the tax receipts, that any moneys have been collected by the Treasurer of Porto Rico improperly, or in excess of the proper amount, upon the approval

of the Governor, the Auditor of Porto Rico is hereby authorized to issue a settlement warrant in favor of the taxpayer for the amount of such excess of the amount improperly paid.''

■ Resting on the false premise that Act No. 40 of 1931 levied a tax on the gasoline imported into Puerto Rico regardless of whether it was introduced for consumption in the Island, the appellant presses the argument that Act No. 217 of 1942 did not levy any new tax, but that it re-levied the one already existing under Act No. 40 of 1931. Since we have shown that the Act of 1931 did not levy any tax on gasoline imported which was not to be consumed in this island, the tax levied by Act No. 217 of 1942 on gasoline ''imported, manufactured, sold, conveyed, used, consumed or produced in Puerto Rico,'' is a new tax and, as such different from the one levied by the Act of 1931 which had a narrower scope. Act No. 217 of 1942, approved after the decision of the Supreme Court of the United States in *West India Oil Co.* v. *Domenech, supra,* was known, does tax the introduction of gasoline regardless of the use for which it is destined.[10]

■ Appellant argues—in case that he does not succeed in his contention to the effect that Act No. 217 of 1942 does not levy a tax different from the one levied by Act No. 40 of 1931—that, assuming that the former levied a tax retroactively, such retroactivity is valid because it tends to cure the alleged error of the Treasury Department in the construction which it gave to Act No. 40 of 1931.

The so-called curative or remedial statutes with retroactive effect are not contrary to the Federal Constitution nor to the Organic Act, provided that the curative statute may

---

[10] With regard to the policy followed by the Legislature of Puerto Rico until 1942, of not levying a tax on gasoline which was not imported for sale or consumption in Puerto Rico, it should be noted that by virtue of Act No. 1 of June 22 of 1942 (Second Special Session, p. 2) all petroleum products that may be distributed from Puerto Rico for use outside of the Island, is exempt from the levying and collection of every excise tax until 90 days after the United States of America ceases hostilities.

be applied without causing an injustice. As stated by Mr. Justice Brandeis in his dissenting opinion in *Untermyer* v. *Anderson*, 276 U. S. 440, 449 (1928), "The need of the Government for revenue has hitherto been deemed a sufficient justification for making a tax measure retroactive *whenever the imposition seemed consonant with justice and the conditions were not such as would ordinarily involve hardship.*" (Italics ours.) A good example of this principle is found in *Graham & Foster* v. *Goodcell*, 282 U. S. 409 (1931), cited by the appellant. In this case the taxpayers had been compelled to pay a tax which they really owed, but the collection of it had prescribed by a mistake of the officer in charge of its collection. Congress passed a law precluding the taxpayers from recovering the amounts which they had paid for the prescribed taxes, The Supreme Court of the United States upheld the validity of the curative statute, because it was consistent with the due process of law, since it was designed to remedy the mistake committed by the authority in charge of the collection of the tax and the circumstances were such that the taxpayers were not subjected to any hardship for, as we have said, they really owed the tax and merely wanted to take advantage of the officer's mistake in order to avoid its payment.

*Paramino Co.* v. *Marshall*, 309 U. S. 370 (1940), is another typical case of this kind of legislation. It appears from that case that on January 17, 1931, the appellee Clark fell while working on the navigable waters of the United States as a longshoreman for the appellant. The other appellant, the Union Insurance Company of Canton, Ltd., was the insurer of the Paramino Lumber Co. under the Compensation Act. The fall having incapacitated the sailor Clark, the appellants voluntarily paid him compensation, and on Clark's application, hearings were held under the Compensation Act. The evidence introduced disclosed that Clark had been treated by his employer's physician who operated

on his twelfth rib and reported that an examination of the eleventh rib showed a firm union at the site of the fracture of that rib. On the basis of this report the Deputy Commissioner concluded, on August 26, 1931, that Clark had been wholly disabled from the date of his fall to July 4 of 1931; that on the latter date he had recovered from the disability; and that he had been paid by the appellants all the compensation due him. No proceedings being brought to review this award, it became final in thirty days. But Clark's pain continued, and four months after the Deputy Commissioner's order, X-rays taken by another physician disclosed that the fracture of the eleventh rib was ununited, and in order to give Clark relief an operation fusing the bone fragments had to be performed. After this operation the rib healed, but in March 1935, the physician who performed the second operation reported that Clark was still experiencing pain in the region of his injury. Since the Deputy Commissioner had no jurisdiction over the case after it had been closed, and since the time for judicial review expired prior to the time of the operation on the eleventh rib, Clark had no opportunity under the Act to have his compensation readjusted. Based on these facts, the Congress passed a private Act directing the Compensation Commission to review Clark's case and to issue a new order, the provisions in the Compensation Act limiting time for reviewing awards to the contrary notwithstanding. By virtue of this private Act the case was taken to court. The appellants challenged the decree below, contending that the private act violated the due process clause of the Fifth Amendment. The appellants contended that the original award was an adjudication which had ceased to be reviewable prior to the enactment of the private Act, and hence their rights and obligations were finally determined; and that they would be deprived of the vested right they had obtained flowing from the Deputy Commisioner's decision, which protected them from further

claims from Clark. Upon deciding this question, the Supreme Court declared that an award under the Longshoremen's and Harbor Workers' Compensation Act determines the liability of employer to employee; but that they did not agree that the immunity obtained by the lapse of the time for review is the type of immunity which protects its beneficiary from retroactive legislation authorizing review of the claim. Said private Act did not set aside a judgment, create a new right of action, or direct the entry of an award. The hearing provided by the private Act was subject to the provisions of the general Act for longshoremen's and harbor workers' compensation. The private Act did not operate to create new obligations where none existed before. It was an Act to cure a defect in administration developed in the handling of a compensable claim. If the continuing injury had been known before the original award was granted, payments of the same amount due under the award authorized by said private Act, would have been granted to the workman by virtue of the first hearing. In such circumstances, the Court declared that there was no violation of the due process clause. See to the same effect *Illinois Cent. R. Co.* v. *Minnesota,* 309 U. S. 157 (1940); *McFaddin* v. *Evans-Snider-Buel Co.,* 185 U. S. 505 (1902); *Wheeler* v. *Commissioner of Internal Revenue,* 143 F. (2d) 162, 166 (1944); Cooley, The Law of Taxation (4th ed.), vol. 4, § 1594, p. 3152, and vol. 1, § 59, p. 156; Frederick A. Ballard, Retroactive Federal Taxation, 48 Harv. L. Rev. 592, 596, 597.

Even conceding that Act No. 217 of 1942 is a curative statute, if in the instant case we should give retroactive effect to the amendment introduced by this Act, we would feel bound to conclude that as to the Act's retroactivity, it is unconstitutional on the ground that the collection, retroactively, of said tax from the appellee for the transactions performed in 1931, 1932, and 1933, would deprive the appellee of its property without the due process of law. This

is so because, as we have seen, the Act of 1931 did not levy any tax on the gasoline imported into Puerto Rico which was subsequently exported, and on the strength of this Act the appellee shipped the gasoline in question and upon selling it in Santo Domingo did not include the tax which it had paid in Puerto Rico and which had been refunded under the Act then in force. It follows, therefore, that if appellee were compelled to pay that tax retroactively it would have no means of recovering the tax on the gasoline which it had sold eleven years before, and would have to pay it out of its own funds, which would be tantamount to depriving it of the amount of the taxes without due process of law. *Nichols* v. *Coolidge,* 274 U. S. 531 (1927); *Coolidge* v. *Long,* 282 U. S. 582 (1931); *P. R. Tobacco Corp.* v. *Buscaglia, Treas.,* 62 P.R.R. 782 (1944). Cf. *Ballester* v. *Court of Tax Appeals,* 61 P.R.R. 460.

Since we have reached the conclusion that Act No. 40 of 1931 did not levy any tax on the gasoline imported and later exported, and that Act No. 217 of 1942, in so far as it tends to levy a tax retroactively on the gasoline imported by the appellee and exported during the years 1931, 1932, and 1933 is unconstitutional, it is unnecessary to discuss the other questions raised by the appellant.

For the aforesaid reasons the judgment appealed from should be affirmed.